GREEN *v.* UNITED STATES.

No. 46.  Argued April 25, 1957.—Restored to the calendar for reargument June 24, 1957.—Reargued October 15, 1957.—Decided December 16, 1957.

*George Blow* argued the cause on the original argument. *George Rublee, II,* was with him on the reargument. With them on the briefs was *Charles E. Ford.*

*Leonard B. Sand* argued the cause for the United States. With him on the briefs were *Solicitor General Rankin, Assistant Attorney General Olney* and *Beatrice Rosenberg. Carl H. Imlay* was also on the brief on the original argument.

Opinion of the Court by MR. JUSTICE BLACK, announced by MR. JUSTICE DOUGLAS.

This case presents a serious question concerning the meaning and application of that provision of the Fifth Amendment to the Constitution which declares that no person shall

".  .  . be subject for the same offence to be twice put in jeopardy of life or limb .  .  . ."

The petitioner, Everett Green, was indicted by a District of Columbia grand jury in two counts. The first charged that he had committed arson by maliciously setting fire to a house.[1] The second accused him of causing the death of a woman by this alleged arson which if true amounted to murder in the first degree punishable by death.[2] Green entered a plea of not guilty to both counts and the case was tried by a jury. After each side had presented its evidence the trial judge instructed the jury that it could find Green guilty of arson under the first count and of either (1) first degree murder or (2) second degree murder under the second count. The trial judge treated second degree murder, which is defined by the District Code as the killing of another with malice

---

[1] D. C. Code, 1951, § 22–401.

[2] D. C. Code, 1951, § 22–2401. "Whoever, being of sound memory and discretion .  .  . without purpose so to do kills another in perpetrating or in attempting to perpetrate any arson, as defined in section 22–401 .  .  . is guilty of murder in the first degree."

Section 22–2404 provides that the "punishment of murder in the first degree shall be death by electrocution."

aforethought and is punishable by imprisonment for a term of years or for life,[3] as an offense included within the language charging first degree murder in the second count of the indictment.

The jury found Green guilty of arson and of second degree murder but did not find him guilty on the charge of murder in the first degree. Its verdict was silent on that charge. The trial judge accepted the verdict, entered the proper judgments and dismissed the jury. Green was sentenced to one to three years' imprisonment for arson and five to twenty years' imprisonment for murder in the second degree. He appealed the conviction of second degree murder. The Court of Appeals reversed that conviction because it was not supported by evidence and remanded the case for a new trial. 95 U. S. App. D. C. 45, 218 F. 2d 856.

On remand Green was tried again for first degree murder under the original indictment. At the outset of this second trial he raised the defense of former jeopardy but the court overruled his plea. This time a new jury found him guilty of first degree murder and he was given the mandatory death sentence. Again he appealed. Sitting *en banc,* the Court of Appeals rejected his defense of former jeopardy, relying on *Trono* v. *United States,* 199 U. S. 521, and affirmed the conviction. 98 U. S. App. D. C. 413, 236 F. 2d 708. One judge concurred in the result, and three judges dissented expressing the view that Green had twice been placed in jeopardy in violation of the Constitution. We granted certiorari, 352 U. S. 915. Although Green raises a number of other contentions here

---

[3] D. C. Code, 1951, § 22–2403. "Whoever with malice aforethought except as provided in [§] 22–2401 . . . kills another, is guilty of murder in the second degree."

§ 22–2404. "The punishment of murder in the second degree shall be imprisonment for life, or for not less than twenty years."

we find it necessary to consider only his claim of former jeopardy.

The constitutional prohibition against "double jeopardy" was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense. In his Commentaries, which greatly influenced the generation that adopted the Constitution, Blackstone recorded:

". . . the plea of *auterfoits acquit,* or a former acquittal, is grounded on this universal maxim of the common law of England, that no man is to be brought into jeopardy of his life more than once for the same offence." [4]

Substantially the same view was taken by this Court in *Ex parte Lange,* 18 Wall. 163, at 169:

"The common law not only prohibited a second punishment for the same offence, but it went further and forbid a second trial for the same offence, whether the accused had suffered punishment or not, and whether in the former trial he had been acquitted or convicted." [5]

The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity,

---

[4] 4 Blackstone's Commentaries 335.

[5] And see *United States* v. *Ball,* 163 U. S. 662, 669: "The prohibition is not against being twice punished, but against being twice put in jeopardy; and the accused, whether convicted or acquitted, is equally put in jeopardy at the first trial."

as well as enhancing the possibility that even though innocent he may be found guilty.

In accordance with this philosophy it has long been settled under the Fifth Amendment that a verdict of acquittal is final, ending a defendant's jeopardy, and even when "not followed by any judgment, is a bar to a subsequent prosecution for the same offence." *United States* v. *Ball,* 163 U. S. 662, 671. Thus it is one of the elemental principles of our criminal law that the Government cannot secure a new trial by means of an appeal even though an acquittal may appear to be erroneous. *United States* v. *Ball, supra; Peters* v. *Hobby,* 349 U. S. 331, 344–345. Cf. *Kepner* v. *United States,* 195 U. S. 100; *United States* v. *Sanges,* 144 U. S. 310.

Moreover it is not even essential that a verdict of guilt or innocence be returned for a defendant to have once been placed in jeopardy so as to bar a second trial on the same charge. This Court, as well as most others, has taken the position that a defendant is placed in jeopardy once he is put to trial before a jury so that if the jury is discharged without his consent he cannot be tried again. *Wade* v. *Hunter,* 336 U. S. 684; *Kepner* v. *United States,* 195 U. S. 100, 128. In general see American Law Institute, Administration of The Criminal Law: Double Jeopardy 61–72 (1935). This prevents a prosecutor or judge from subjecting a defendant to a second prosecution by discontinuing the trial when it appears that the jury might not convict. At the same time jeopardy is not regarded as having come to an end so as to bar a second trial in those cases where "unforeseeable circumstances . . . arise during [the first] trial making its completion impossible, such as the failure of a jury to agree on a verdict." *Wade* v. *Hunter,* 336 U. S. 684, 688–689.

At common law a convicted person could not obtain a new trial by appeal except in certain narrow instances.[6] As this harsh rule was discarded courts and legislatures provided that if a defendant obtained the reversal of a conviction by his own appeal he could be tried again for the same offense.[7] Most courts regarded the new trial as a second jeopardy but justified this on the ground that the appellant had "waived" his plea of former jeopardy by asking that the conviction be set aside.[8] Other courts viewed the second trial as continuing the same jeopardy which had attached at the first trial by reasoning that jeopardy did not come to an end until the accused was acquitted or his conviction became final.[9] But whatever the rationalization, this Court has also held that a defendant can be tried a second time for an offense when his prior conviction for that same offense had been set aside on appeal. *United States* v. *Ball,* 163 U. S. 662.

In this case, however, we have a much different question. At Green's first trial the jury was authorized to find him guilty of either first degree murder (killing while

---

[6] See 1 Stephen, History of the Criminal Law of England, c. x; *United States* v. *Gibert,* 25 Fed. Cas. 1287.

[7] Under English law the appellate court has no power to order a new trial after any appeal except in certain cases where the first trial was a complete "nullity," as for example when the trial court was without jurisdiction over the person or subject matter. See 4 Stephen, Commentaries on the Laws of England (21st ed. 1950), 284. The English appellate court does have power to substitute a finding of guilt of a lesser offense if the evidence warrants, but it cannot find the defendant guilty of an offense for which he was acquitted or increase his sentence. See 10 Halsbury, Laws of England (Simonds ed. 1955), 539–541, and the cases cited there.

[8] See, *e. g., Brewster* v. *Swope,* 180 F. 2d 984; *State* v. *McCord,* 8 Kan. 232, 12 Am. Rep. 469; *Cross* v. *Commonwealth,* 195 Va. 62, 77 S. E. 2d 447; *Smith* v. *State,* 196 Wis. 102, 219 N. W. 270.

[9] See, *e. g., State* v. *Aus,* 105 Mont. 82, 69 P. 2d 584. Cf. *Griffin* v. *Illinois,* 351 U. S. 12, 18.

perpetrating a felony) or, alternatively, of second degree murder (killing with malice aforethought).[10] The jury found him guilty of second degree murder, but on his appeal that conviction was reversed and the case remanded for a new trial. At this new trial Green was tried again, not for second degree murder, but for first degree murder, even though the original jury had refused to find him guilty on that charge and it was in no way involved in his appeal.[11] For the reasons stated hereafter, we conclude that this second trial for first degree murder placed Green in jeopardy twice for the same offense in violation of the Constitution.[12]

Green was in direct peril of being convicted and punished for first degree murder at his first trial. He was forced to run the gantlet once on that charge and the jury refused to convict him. When given the choice between finding him guilty of either first or second degree murder it chose the latter. In this situation the great majority of cases in this country have regarded the jury's verdict as an implicit acquittal on the charge of first degree murder.[13] But the result in this case need not rest alone

[10] In substance the situation was the same as though Green had been charged with these different offenses in separate but alternative counts of the indictment. The constitutional issues at stake here should not turn on the fact that both offenses were charged to the jury under one count.

[11] It should be noted that Green's claim of former jeopardy is not based on his previous conviction for second degree murder but instead on the original jury's refusal to convict him of first degree murder.

[12] Many of the state courts which have considered the problem have concluded that under circumstances similar to those of this case a defendant cannot be tried a second time for first degree murder. Other state cases take a contrary position. In general see the Annotations at 59 A. L. R. 1160, 22 L. R. A. (N. S.) 959, and 5 L. R. A. (N. S.) 571. Of course, many of the state decisions rest on local constitutional or statutory provisions.

[13] See cases collected in the Annotations cited in n. 12, *supra,* and the Annotation at 114 A. L. R. 1406.

on the assumption, which we believe legitimate, that the jury for one reason or another acquitted Green of murder in the first degree. For here, the jury was dismissed without returning any express verdict on that charge and without Green's consent. Yet it was given a full opportunity to return a verdict and no extraordinary circumstances appeared which prevented it from doing so. Therefore it seems clear, under established principles of former jeopardy, that Green's jeopardy for first degree murder came to an end when the jury was discharged so that he could not be retried for that offense. *Wade* v. *Hunter*, 336 U. S. 684. In brief, we believe this case can be treated no differently, for purposes of former jeopardy, than if the jury had returned a verdict which expressly read: "We find the defendant not guilty of murder in the first degree but guilty of murder in the second degree."

After the original trial, but prior to his appeal, it is indisputable that Green could not have been tried again for first degree murder for the death resulting from the fire. A plea of former jeopardy would have absolutely barred a new prosecution even though it might have been convincingly demonstrated that the jury erred in failing to convict him of that offense. And even after appealing the conviction of second degree murder he still could not have been tried a second time for first degree murder had his appeal been unsuccessful.

Nevertheless the Government contends that Green "waived" his constitutional defense of former jeopardy to a second prosecution on the first degree murder charge by making a *successful* appeal of his improper conviction of second degree murder. We cannot accept this paradoxical contention. "Waiver" is a vague term used for a great variety of purposes, good and bad, in the law. In any normal sense, however, it connotes some kind of voluntary knowing relinquishment of a right. Cf. *Johnson* v. *Zerbst,* 304 U. S. 458. When a man has been convicted

of second degree murder and given a long term of imprisonment it is wholly fictional to say that he "chooses" to forego his constitutional defense of former jeopardy on a charge of murder in the first degree in order to secure a reversal of an erroneous conviction of the lesser offense. In short, he has no meaningful choice. And as Mr. Justice Holmes observed, with regard to this same matter in *Kepner* v. *United States,* 195 U. S. 100, at 135: "Usually no such waiver is expressed or thought of. Moreover, it cannot be imagined that the law would deny to a prisoner the correction of a fatal error, unless he should waive other rights so important as to be saved by an express clause in the Constitution of the United States."

It is true that in *Kepner,* a case arising in the Philippine Islands under a statutory prohibition against double jeopardy, Mr. Justice Holmes dissented from the Court's holding that the Government could not appeal an acquittal in a criminal prosecution. He argued that there was only one continuing jeopardy until the "case" had finally been settled, appeal and all, without regard to how many times the defendant was tried, but that view was rejected by the Court. The position taken by the majority in *Kepner* is completely in accord with the deeply entrenched principle of our criminal law that once a person has been acquitted of an offense he cannot be prosecuted again on the same charge. This Court has uniformly adhered to that basic premise. For example, in *United States* v. *Ball,* 163 U. S. 662, 671, a unanimous Court held:

> "The verdict of acquittal was final, and could not be reviewed, on error or otherwise, without putting [the defendant] twice in jeopardy, and thereby violating the Constitution."

And see *Peters* v. *Hobby,* 349 U. S. 331, 344–345; *United States* v. *Sanges,* 144 U. S. 310.

Using reasoning which purports to be analogous to that expressed by Mr. Justice Holmes in *Kepner,* the Government alternatively argues that Green, by appealing, prolonged his original jeopardy so that when his conviction for second degree murder was reversed and the case remanded he could be tried again for first degree murder without placing him in new jeopardy. We believe this argument is also untenable. Whatever may be said for the notion of continuing jeopardy with regard to an offense when a defendant has been convicted of that offense and has secured reversal of the conviction by appeal, here Green was not convicted of first degree murder and that offense was not involved in his appeal. If Green had only appealed his conviction of arson and that conviction had been set aside surely no one would claim that he could have been tried a second time for first degree murder by reasoning that his initial jeopardy on that charge continued until every offense alleged in the indictment had been finally adjudicated.

Reduced to plain terms, the Government contends that in order to secure the reversal of an erroneous conviction of one offense, a defendant must surrender his valid defense of former jeopardy not only on that offense but also on a different offense for which he was not convicted and which was not involved in his appeal. Or stated in the terms of this case, he must be willing to barter his constitutional protection against a second prosecution for an offense punishable by death as the price of a successful appeal from an erroneous conviction of another offense for which he has been sentenced to five to twenty years' imprisonment. As the Court of Appeals said in its first opinion in this case, a defendant faced with such a "choice" takes a "desperate chance" in securing the reversal of the erroneous conviction. The law should not, and in our judgment does not, place the defendant in such an incredible dilemma. Conditioning an appeal of one

offense on a coerced surrender of a valid plea of former jeopardy on another offense exacts a forfeiture in plain conflict with the constitutional bar against double jeopardy.[14]

The Government argues, however, that we should accept *Trono* v. *United States,* 199 U. S. 521, as a conclusive precedent against Green's claim of former jeopardy.[15] The *Trono* case arose in the Philippine Is-

---

[14] The suggestion is made that under the District Code second degree murder is not an offense included in a charge of first degree murder for causing a death in the course of perpetrating a felony (commonly referred to as "felony murder") because it involves elements different from those necessary to establish the felony murder, and that therefore Green could not legally have been convicted of second degree murder under the indictment. We fail to comprehend how this suggestion aids the Government. In the first place, the District of Columbia Court of Appeals has expressly held that second degree murder is a lesser offense which can be proved under a charge of felony murder. *Goodall* v. *United States,* 86 U. S. App. D. C. 148, 180 F. 2d 397; *Green* v. *United States,* 95 U. S. App. D. C. 45, 218 F. 2d 856. Even more important, Green's plea of former jeopardy does not rest on his conviction for second degree murder but instead on the first jury's refusal to find him guilty of felony murder.

It is immaterial whether second degree murder is a lesser offense included in a charge of felony murder or not. The vital thing is that it is a distinct and different offense. If anything, the fact that it cannot be classified as "a lesser included offense" under the charge of felony murder buttresses our conclusion that Green was unconstitutionally twice placed in jeopardy. American courts have held with uniformity that where a defendant is charged with two offenses, neither of which is a lesser offense included within the other, and has been found guilty on one but not on the second he cannot be tried again on the second even though he secures reversal of the conviction and even though the two offenses are related offenses charged in the same indictment. See, *e. g.,* Annotation, 114 A. L. R. 1406.

[15] With the exception of *Trono,* the Government appears to concede in its brief, pp. 38–39, that the double jeopardy problem raised in this case has not been squarely before this Court. *Palko* v. *Connecticut,* 302 U. S. 319, *Brantley* v. *Georgia,* 217 U. S. 284, and *Kring* v. *Missouri,* 107 U. S. 221, are not controlling here since they involved

lands, shortly after they had been annexed by the United States, under a statutory prohibition against double jeopardy. At that time a sharply divided Court took the view that not all constitutional guarantees were "applicable" in the insular possessions, particularly where the imposition of these guarantees would disrupt established customs. *Downes* v. *Bidwell,* 182 U. S. 244. In *Trono* the defendants had been charged with murder but were acquitted by the trial court which instead found them guilty of the lesser offense of assault. They appealed the assault conviction to the Philippine Supreme Court. That court, acting under peculiar local procedures modeled on pre-existing Spanish practices, which allowed it to review the facts and law and to substitute its findings for those of the trial judge, set aside their acquittal, found them guilty of murder and increased their sentences.

On review by this Court, Mr. Justice Peckham, writing for himself and three other Justices, took the position that by appealing the conviction for assault the defendants waived their plea of former jeopardy with regard to the charge of murder. He said:

> "We do not agree to the view that the accused has the right to limit his waiver as to jeopardy, when he appeals from a judgment against him. As the judgment stands before he appeals, it is a complete bar to any further prosecution for the offense set forth in the indictment . . . . No power can wrest from him the right to so use that judgment, but if he chooses to appeal from it . . . he thereby waives, if successful, his right to avail himself of the former acquittal of the greater offense . . . ." 199 U. S., at 533.

---

trials in state courts. *Stroud* v. *United States,* 251 U. S. 15, is clearly distinguishable. In that case a defendant was retried for first degree murder after he had successfully asked an appellate court to set aside a prior conviction for that same offense.

Mr. Justice Holmes refused to join the Peckham opinion but concurred in the result. Just the year before, in *Kepner* v. *United States,* 195 U. S. 100, 135, he had sharply denounced the notion of "waiver" as indefensible. There is nothing which indicates that his views had changed in the meantime. As pointed out above, he did dissent from the holding in *Kepner*—that the Government could not appeal an acquittal—on the ground that a new trial after an appeal by the Government was part of a continuing jeopardy rather than a second jeopardy. But that contention has been consistently rejected by this Court.

Chief Justice Fuller and Justices Harlan, White, and McKenna dissented in *Trono.* Mr. Justice McKenna wrote a dissent which was concurred in by Justices White and Harlan. During the course of this opinion he stated:

> "It is, in effect, held that because the defendants . . . appealed and sought a review, as authorized by the statute, of the minor offense for which they were convicted, the United States was given the right to try them for the greater offense for which they were acquitted. . . . I think that the guarantees of constitutions and laws should not be so construed. . . . I submit that the State seeks no convictions except in legal ways, and because it does not it affords means of review of erroneous rulings and judgments, and freely affords such means. It does not clog them with conditions or forfeit by their exercise great and constitutional rights.

> .  .  .  .  .

> "Here and there may be found a decision which supports the exposition of once in jeopardy expressed in the [Peckham] opinion. Opposed to it is the general consensus of opinion of American text books on criminal law and the overwhelming weight of American decided cases." 199 U. S., at 538–539, 540.

We do not believe that *Trono* should be extended beyond its peculiar factual setting to control the present case. All that was before the Court in *Trono* was a statutory provision against double jeopardy pertaining to the Philippine Islands—a territory just recently conquered with long-established legal procedures that were alien to the common law.[16] Even then it seems apparent that a majority of the Court was unable to agree on any common ground for the conclusion that an appeal of a lesser offense destroyed a defense of former jeopardy on a greater offense for which the defendant had already been acquitted. As a matter of fact, it appears that each of the rationalizations advanced to justify this result was rejected by a majority of the Court. As Mr. Justice Holmes, who concurred in the result, effectively demonstrated, the "waiver theory" is totally unsound and indefensible. On the other hand Mr. Justice Holmes' theory of continuing jeopardy has never outwardly been adhered to by any other Justice of this Court.[17]

---

[16] In the course of his opinion Mr. Justice Peckham made some general observations to the effect that he regarded the statutory provision as having the same effect as the Fifth Amendment. Those remarks were not essential to the decision so that even if they had been accepted by the full Court they would not be conclusive in this case where the interpretation of the Fifth Amendment is necessarily decisive. Cf. *Cohens* v. *Virginia*, 6 Wheat. 264, 399; *Humphrey's Executor* v. *United States*, 295 U. S. 602, 626–627.

[17] Mr. Justice White and Mr. Justice McKenna who dissented with Mr. Justice Holmes in *Kepner* refused to agree with the Court in *Trono*. In his dissent in the latter case Mr. Justice McKenna attributed his vote in *Kepner* to the fact that the Philippine Islands had a system of jurisprudence which was totally different from ours in that it provided no trial by jury and traditionally had permitted appellate courts to review both the law and the facts in criminal cases and to substitute their findings for those made by the trial judge. Justice Peckham, in his opinion, also recognized the peculiar nature of these Philippine procedures.

We believe that if either of the rationales offered to support the *Trono* result were adopted here it would unduly impair the constitutional prohibition against double jeopardy. The right not to be placed in jeopardy more than once for the same offense is a vital safeguard in our society, one that was dearly won and one that should continue to be highly valued. If such great constitutional protections are given a narrow, grudging application they are deprived of much of their significance. We do not feel that *Trono* or any other decision by this Court compels us to forego the conclusion that the second trial of Green for first degree murder was contrary to both the letter and spirit of the Fifth Amendment.

*Reversed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BURTON, MR. JUSTICE CLARK and MR. JUSTICE HARLAN join, dissenting.

On the basis of the following facts the Court has concluded that petitioner has twice been put in jeopardy of life in violation of the Fifth Amendment to the Constitution.[1]

Petitioner was tried under an indictment on two counts. The first count charged arson under D. C. Code, 1951, § 22-401. The second count charged murder in the first degree under D. C. Code, 1951, § 22-2401, in that in perpetrating the arson petitioner had caused the death of one Bettie Brown. In submitting the case to the jury under the second count, the trial court instructed on both first and second degree murder. The jury returned a verdict finding petitioner guilty of arson under the first count and of second degree murder under the second count; the verdict was silent on the charge of first degree

---

[1] "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ."

murder. The court entered judgment on the verdict, and sentenced petitioner to terms of imprisonment of one to three years on the first count of the indictment and five to twenty years on the second count.

Petitioner appealed his conviction of second degree murder, contending that there was no evidence to support a verdict for that offense. The Court of Appeals sustained this claim. It reversed the conviction and ordered a new trial on the ground that, since there was no basis in the evidence for finding petitioner guilty of murder in the second degree, it was error to instruct the jury on that issue. 95 U. S. App. D. C. 45, 218 F. 2d 856.[2] Petitioner was retried on the second count of the indictment, convicted of first degree murder, and sentenced to death. The Court of Appeals, the nine judges sitting *en banc,* affirmed this conviction, rejecting petitioner's contention that he had been put twice in jeopardy of his life in violation of the Federal Constitution, 98 U. S. App. D. C. 413, 236 F. 2d 708, Chief Judge Edgerton and Judges Bazelon and Fahy dissenting.

Since the prohibition in the Constitution against double jeopardy is derived from history, its significance and scope must be determined, "not simply by taking the words and a dictionary, but by considering [its] . . . origin and the line of [its] . . . growth." *Gompers* v. *United States,* 233 U. S. 604, 610.

---

[2] In reversing petitioner's conviction the court observed that: "In seeking a new trial at which—if the evidence is substantially as before—the jury will have no choice except to find him guilty of first degree murder or to acquit him, Green is manifestly taking a desperate chance. He may suffer the death penalty. At oral argument we inquired of his counsel whether Green clearly understood the possible consequence of success on this appeal, and were told the appellant, who is 64 years of age, says he prefers death to spending the rest of his life in prison. He is entitled to a new trial." 95 U. S. App. D. C. 45, 48, 218 F. 2d 856, 859.

The origin of this constitutional protection is found in the common-law pleas of *autrefois acquit* and *autrefois convict*. In *Vaux's Case,* 4 Co. Rep. 44a, 45a, it was accepted as established that "the life of a man shall not be twice put in jeopardy for one and the same offence, and that is the reason and cause that *auterfoits* acquitted or convicted of the same offence is a good plea . . . ." Likewise Blackstone stated that "the plea of *auterfoits acquit,* or a former acquittal, is grounded on this universal maxim of the common law of England, that no man is to be brought into jeopardy of his life, more than once, for the same offence. And hence it is allowed as a consequence, that when a man is once fairly found not guilty upon any indictment, or other prosecution, before any court having competent jurisdiction of the offence, he may plead such acquittal in bar of any subsequent accusation for the same crime." 4 Bl. Comm. 335. To try again one who had been previously convicted or acquitted of the same offense was "abhorrent to the law of England." *Regina* v. *Tancock,* 13 Cox C. C. 217, 220; see *The King* v. *Emden,* 9 East 437, 445–447.

A principle so deeply rooted in the law of England, as an indispensable requirement of a civilized criminal procedure, was inevitably part of the legal tradition of the English Colonists in America. The Massachusetts Body of Liberties of 1641, an early compilation of principles drawn from the statutes and common law of England, declared that, "No man shall be twise sentenced by Civill Justice for one and the same Crime, offence, or Trespasse," and that "Everie Action betweene partie and partie, and proceedings against delinquents in Criminall causes shall be briefly and destinctly entered on the Rolles of every Court by the Recorder thereof. That such actions be not afterwards brought againe to the vexation of any man." Colonial Laws of Massachusetts 43, 47.

Thus the First Congress, which proposed the Bill of Rights, came to its task with a tradition against double jeopardy founded both on ancient precedents in the English law and on legislation that had grown out of colonial experience and necessities. The need for the principle's general protection was undisputed, though its scope was not clearly defined. Fear of the power of the newly established Federal Government required "an explicit avowal in [the Constitution] . . . of some of the plainest and best established principles in relation to the rights of the citizens, and the rules of the common law." *People* v. *Goodwin,* 18 Johns. (N. Y.) 187, 202. Although many States in ratifying the Constitution had proposed amendments considered indispensable to secure the rights of the citizen against the Federal Government, New York alone proposed a prohibition against double jeopardy. This is not surprising in view of the fact that only in New Hampshire had the common-law principle been embodied in a constitutional provision. 2 Poore, Federal and State Constitutions, Colonial Charters and other Organic Laws (2d ed.), 1282. The bill of rights adopted by the New York convention, and transmitted to Congress with its ratification of the Constitution, included a declaration that, "no Person ought to be put twice in Jeopardy of Life or Limb for one and the same Offence, nor, unless in case of impeachment, be punished more than once for the same Offence." Documents Illustrative of the Formation of the Union, H. R. Doc. No. 398, 69th Cong., 1st Sess. 1035. This declaration was doubtless before Madison when he drafted the constitutional amendments to be proposed to the States.

The terms in which Madison introduced into the House what became the specific provision that is our present concern were these: "No person shall be subject, except in cases of impeachment, to more than one punishment

or one trial for the same offence . . . ." 1 Annals of Cong. 434. Debate on this provision in the Committee of the Whole evidenced a concern that the language should express what the members understood to be the established common-law principle. There was fear that, as proposed by Madison, it might be taken to prohibit a second trial even when sought by a defendant who had been convicted. Representative Benson of New York objected to the provision because he presumed it was meant to express the established principle "that no man's life should be more than once put in jeopardy for the same offence; yet it was well known, that they were entitled to more than one trial." 1 Annals of Cong. 753. Others who spoke agreed that although of course there could be no second trial following an acquittal, the prohibition should not extend to a second trial when a conviction had been set aside. The provision as amended by the Senate, S. J., 1st Cong., 1st Sess. 77, and eventually ratified as part of the Fifth Amendment to the Constitution, was substantially in the language used by Representative Benson to express his understanding of the common law.

The question that had concerned the House in debating Madison's proposal, the relation between the prohibition against double jeopardy and the power to order a new trial following conviction, was considered at length by Mr. Justice Story, on circuit, in *United States* v. *Gibert,* 25 Fed. Cas. 1287, 1294–1303 (1834). The defendants in that case had been found guilty of robbery on the high seas, a capital offense, and moved for a new trial. Mr. Justice Story, after full consideration of the English and American authorities, concluded that the court had no power to grant a new trial when the first trial had been duly had on a valid indictment before a court of competent jurisdiction. According to his view, the prohibition against double jeopardy applied equally whether the de-

fendant had been acquitted or convicted, and there was no exception for a case where the new trial was sought by the defendant for his own benefit. Earlier, Mr. Justice Story had himself taken a non-literal view of the constitutional provision in *United States* v. *Perez,* 9 Wheat. 579, where, writing for the Court, he found that discharge of a jury that had failed to agree was no bar to a second trial. See also 3 Story, Commentaries on The Constitution (1833), 659–660.

Story's conclusion that English law prohibited, except in rare instances, granting a new trial after conviction of a felony was undoubtedly correct, see *The King* v. *Mawbey,* 6 T. R. 619, 638, and on occasion this result has been expressly made to depend on the maxim prohibiting double jeopardy. *The Queen* v. *Murphy,* 2 L. R. P. C. 535, 547–548; see *The Attorney-General* v. *Bertrand,* 1 L. R. P. C. 520, 531–534; but see *The Queen* v. *Scaife,* 17 Q. B. 238. To this day the Court of Criminal Appeals has ordinarily no power to order a new trial even after quashing a conviction on appeal by the defendant, Criminal Appeal Act, 7 Edw. VII, c. 23, s. 4 (2), and repeated efforts to secure this power for the court have met with the argument that a new trial would, at least in spirit, offend the principle that a defendant may not be put twice in jeopardy for the same offense. See 176 H. L. Deb. (5th ser. 1952) 759–763.

The old practice of the English courts, and the position taken by Mr. Justice Story, however, was generally rejected in the United States. The power to grant a new trial in the most serious cases appears to have been exercised by many American courts from an early date in spite of provisions against double jeopardy. *United States* v. *Fries,* 3 Dall. 515 (treason); see *People* v. *Morrison,* 1 Parker's Crim. Rep. (N. Y.) 625, 626–643 (rape). In *United States* v. *Keen,* 26 Fed. Cas. 686, 687–690, a decision rendered only five years after *United States* v.

*Gibert, supra,* Mr. Justice McLean, on circuit, vigorously rejected the view that the constitutional provision prohibited a new trial on the defendant's motion after a conviction, or that it "guarantees to him the right of being hung, to protect him from the danger of a second trial." See 26 Fed. Cas., at 690. Other federal courts that had occasion to consider the question also rejected Mr. Justice Story's position, see *United States* v. *Williams,* 28 Fed. Cas. 636, 641; *United States* v. *Harding,* 26 Fed. Cas. 131, 136–138, and statements by this Court cast serious doubt on its validity. See *Ex parte Lange,* 18 Wall. 163, 173–174, and Mr. Justice Clifford dissenting at 201–204. In *Hopt* v. *Utah,* 104 U. S. 631, 110 U. S. 574, 114 U. S. 488, 120 U. S. 430, the defendant was in fact retried three times following reversals of his convictions.

Finally, *United States* v. *Ball,* 163 U. S. 662–671, expressly rejected the view that the double jeopardy provision prevented a second trial when a conviction had been set aside. Two of the defendants in the case had been convicted of murder, and on writ of error the judgments were reversed with directions to quash the indictment. The same defendants were then convicted on a new indictment. In affirming these convictions the Court said, "it is quite clear that a defendant, who procures a judgment against him upon an indictment to be set aside, may be tried anew upon the same indictment, or upon another indictment, for the same offence of which he had been convicted." 163 U. S., at 672. On a literal reading of the constitutional provision, with an eye exclusively to the interests of the defendants, they had been "once in jeopardy," and were entitled to the benefit of a reversal of their convictions without the hazard of a new trial. The Court recognized, however, that such a wooden interpretation would distort the purposes of the constitutional provision to the prejudice of society's legitimate interest in convicting the guilty as much as,

in *United States* v. *Gibert,* they had been distorted to the prejudice of the defendants. See also *Murphy* v. *Massachusetts,* 177 U. S. 155, 158–160.

The precise question now here first came before a federal court in *United States* v. *Harding,* 26 Fed. Cas. 131. There three defendants had been jointly indicted and tried for murder. One was convicted of murder and two of manslaughter, and all moved for a new trial. A new trial was ordered for the defendant convicted of murder, and as to the other two defendants the case was continued to allow them to decide whether they would take a new trial or abide by their convictions. Mr. Justice Grier warned these defendants:

> "You ought clearly to understand and weigh well the position in which you now stand. You have been once tried and acquitted of the higher grade of offence charged against you in this indictment, the penalty affixed to which is death; but . . . you have escaped. . . . But let me now solemnly warn you to consider well the choice you shall make. Another jury instead of acquitting you altogether, may find you guilty of the whole indictment, and thus your lives may become forfeit to the law." 26 Fed. Cas., at 138.

In thus assuming that the defendants could be retried for the greater offense of murder without violating the prohibition against double jeopardy, Mr. Justice Grier evidently drew upon a familiar background and what he took to be established practice in the federal courts. To one versed in these traditions, the choice to which the defendants were put in abiding by their convictions or obtaining a new trial, on which the entire question of their guilt would be open to re-examination, seemed legally speaking a matter of course.

Not until *Trono* v. *United States,* 199 U. S. 521 (1905), more than fifty years after the *Harding* case, did the ques-

tion that had there been passed upon by Mr. Justice Grier first come before this Court. *Trono* v. *United States* came here from the Philippine Islands. The plaintiffs in error had been proceeded against in a court of first instance on a complaint accusing them of murder in the first degree. They were acquitted of this charge, but convicted of the included offense of assault. They appealed to the Supreme Court of the Philippines, and that court, exercising a jurisdiction similar to that conferred by Spanish law on the former Audiencia to review the whole case both on the facts and the law, reversed the judgment of the court of first instance, convicted the plaintiffs in error of the crime of "homicide," or murder in the second degree, and increased the punishment imposed by the court of first instance. The plaintiffs in error then sought review by this Court, claiming that the action of the Supreme Court of the Philippines had placed them twice in jeopardy in contravention of the declaration of rights contained in § 5 of the Act of July 1, 1902, for the Government of the Philippines. The provision in the statute relied on by the plaintiffs in error declared that, "no person for the same offense shall be twice put in jeopardy of punishment . . . ." 32 Stat. 692. This language, it will be noted, is substantially identical with that in the Fifth Amendment to the Constitution, upon which petitioner in the present case relies. Its legal relation to the Fifth Amendment calls for later consideration.

This Court affirmed the judgment of the Supreme Court of the Philippines, holding that since the plaintiffs in error had appealed their convictions of the lower offense in order to secure a reversal, there was no bar to convicting them of the higher offense in proceedings in the appellate court that were tantamount to a new trial. After canvassing state and federal precedents, Mr. Justice Peckham concluded that, "the better doctrine is that

which does not limit the court or jury, upon a new trial, to a consideration of the question of guilt of the lower offense of which the accused was convicted on the first trial, but that the reversal of the judgment of conviction opens up the whole controversy and acts upon the original judgment as if it had never been." 199 U. S., at 533. It was pointed out that in permitting retrial for the greater offense the Court only applied the principle laid down in *United States* v. *Ball, supra,* and that the result was justified not only on the theory that the accused had "waived" their right not to be retried, but also on the ground that, "the constitutional provision was really never intended to, and, properly construed, does not cover, the case of a judgment under these circumstances, which has been annulled by the court at the request of the accused . . . ." 199 U. S., at 534.

The Court in *Trono* left no doubt that its decision did not turn on any surviving peculiarities of Spanish procedure, or on the fact that the plaintiffs in error relied on a statutory provision rather than on the Fifth Amendment itself. "We may regard the question as thus presented," stated Mr. Justice Peckham, "as the same as if it arose in one of the Federal courts in this country, where, upon an indictment for a greater offense, the jury had found the accused not guilty of that offense, but guilty of a lower one which was included in it, and upon an appeal from that judgment by the accused a new trial had been granted by the appellate court, and the question was whether, upon the new trial accorded, the accused could be again tried for the greater offense . . . ." 199 U. S., at 530. The dissenters did not dispute this view of the case, but on the contrary were concerned with the Court's holding precisely because of its constitutional implications. Mr. Justice Harlan adhered to the view he had taken in earlier cases that the Bill of Rights applied to the Islands, and Mr. Justice McKenna in the principal

dissent observed that, "Let it be remembered that we are dealing with a great right, I may even say a constitutional right, for the opinion of the court discusses the case as though it were from a Circuit Court of the United States." 199 U. S., at 539.

The scope and significance of the *Trono* case is underscored by the Court's decision in *Kepner* v. *United States,* 195 U. S. 100, rendered only a year before. That case also arose in the Philippine Islands. The plaintiff in error had been acquitted by the court of first instance of the offense with which he was charged. On appeal by the Government to the Supreme Court of the Islands, the judgment was reversed and the plaintiff in error convicted. In this Court both the Attorney General for the Philippines and the Solicitor General of the United States contended that § 5 of the Act of July 1, 1902, which included the same prohibition against double jeopardy involved in the *Trono* case, should be construed in the light of the system of law prevailing in the Philippines before they were ceded to the United States. Brief for the Attorney General of the Philippines, pp. 6–16, 29–38; Brief for the Solicitor General, pp. 34–44. Under that jurisprudence, proceedings in the Supreme Court, or Audiencia, were regarded not as a new trial but as an extension of preliminary proceedings in the court of first instance. The entire proceedings constituted one continuous trial, and the jeopardy that attached in the court of first instance did not terminate until final judgment had been rendered by the Audiencia.

The Court rejected the Government's contention and held that the proceedings after acquittal had placed the accused twice in jeopardy. Whatever the Spanish tradition, the purpose of Congress was "to carry some at least of the essential principles of American constitutional jurisprudence to these islands and to engraft them upon the law of this people, newly subject to our jurisdiction."

"This case does not . . . require determination of the question whether the jeopardy clause [of the Fifth Amendment] became the law of the islands . . . without Congressional action, as the act of Congress made it the law of these possessions when the accused was tried and convicted." 195 U. S., at 121–122, 125. The Court also rejected the suggestion that the rights enumerated in the Act of Congress could have been used "in any other sense than that which has been placed upon them in construing the instrument from which they were taken . . . ." 195 U. S., at 124. Mr. Justice Holmes, dissenting, found the case "of great importance, not only in its immediate bearing upon the administration of justice in the Philippines, but, since the words used in the Act of Congress are also in the Constitution, even more because the decision necessarily will carry with it an interpretation of the latter instrument." 195 U. S., at 134.

The legislative history of the Philippine Bill of Rights, § 5 of the Act of July 1, 1902, made inevitable the Court's conclusion that by its enactment Congress extended to the Islands the double jeopardy provision of the Fifth Amendment, notwithstanding surviving Spanish procedures, so that the Court should construe the statute as it would the constitutional provision itself. President McKinley, in his famous instructions to the Philippine Commission, dated April 7, 1900, drawn by a leader of the American Bar, Secretary of War Elihu Root, had stated that

"the Commission should bear in mind, and the people of the Islands should be made plainly to understand, that there are certain great principles of government which have been made the basis of our governmental system, which we deem essential to the rule of law and the maintenance of individual freedom, and of which they have, unfortunately, been denied the experience possessed by us; that there are also certain practical rules of government which

we have found to be essential to the preservation of these great principles of liberty and law, and that these principles and these rules of government must be established and maintained in their islands for the sake of their liberty and happiness, however much they may conflict with the customs or laws of procedure with which they are familiar. It is evident that the most enlightened thought of the Philippine Islands fully appreciates the importance of these principles and rules, and they will inevitably within a short time command universal assent. Upon every division and branch of the Government of the Philippines, therefore, must be imposed these inviolable rules:

"That no person shall be deprived of life, liberty, or property without due process of law; that private property shall not be taken for public use without just compensation; that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense; that excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted; that no person shall be put twice in jeopardy for the same offense . . . ." 1 Public Laws of the Philippine Commission, p. LXVI.[3]

---

[3] These instructions were drawn up for the guidance of the Commission headed by William Howard Taft. In 1912, W. Cameron Forbes, then Governor General of the Philippines, asked Taft "what the history of the formation of the Philippine policy was, who it was that had written the instructions by President McKinley to the Taft Commission. He informed me that this was the work of Secretary Root, who wrote the letter of instructions, after which

As the Court pointed out, "These principles were not taken from the Spanish law; they were carefully collated from our own Constitution, and embody almost verbatim the safeguards of that instrument for the protection of life and liberty." 195 U. S., at 124. In the Act of July 1, 1902, Congress adopted, almost in the language of the President's instructions, the fundamental provisions he considered must be engrafted onto Philippine law, and the historical context in which Congress acted leaves no doubt that it was also actuated by the same purpose as the President, to extend to the Philippines "certain great principles of government which have been made the basis of our governmental system . . . ." 1 Public Laws of the Philippine Commission, p. LXVI. In the double jeopardy provision of § 5 Congress did not fashion a novel principle specially adapted to Philippine conditions and different from what was familiar to American constitu-

---

he had read them over to him (Judge Taft) and other members of his Commission, and that some suggestions and modifications were made but that the main work was intact." 1 Forbes, The Philippine Islands, 130, n. 2. In an address in 1913, Taft stated that the instructions "had a conspicuous place in the history of our relations to the Philippines, and a Congressional indorsement, given to but few documents in the whole history of our country. It secured to the Philippine people all the guaranties of our Bill of Rights except trial by jury and the right to bear arms. It was issued by President McKinley as commander-in-chief of the Army and Navy in the exercise of a power which Congress was glad to leave to him without intervention for four years. He had thus the absolute control of what should be done in the way of establishing government in the Philippine Islands, and this letter to Mr. Root was the fundamental law of a civil government established under military authority. Subsequently, in 1902, when Congress assumed responsibility, it formally adopted and expressly ratified this letter of instructions, and declared that it, as supplemented by the remaining provisions of the statute, should be the Constitution of the Government of the Philippine Islands, and the charter of the liberties of the Filipino people." 2 Forbes, The Philippine Islands, 500.

tional thought. On the contrary, it extended over those newly subject to our jurisdiction the specific command of the Fifth Amendment, as construed and developed in the decisions of this Court. The Court in the *Kepner* and *Trono* cases, therefore, following the statutory language itself, emphasized by its legislative history, construed the double jeopardy provision of § 5 as though it were construing the same provision in the United States Constitution. See also *Weems* v. *United States,* 217 U. S. 349, 367–368. The background of these decisions, and the expressed understanding of the Court on the nature and scope of the provision construed, make them direct authority in all cases arising under the double jeopardy provision of the Fifth Amendment.

The decision in *Trono* was emphatically a decision of the Court. Although Mr. Justice Holmes concurred in the result only, and not in the opinion of Mr. Justice Peckham, there can be no doubt of where he stood. He had dissented in the *Kepner* case on the ground that trial and retrial constituted one procedure entailing one continuous jeopardy, and that there could be no second jeopardy until a conviction or acquittal free from legal error had been obtained. He was dissatisfied with the opinion of Mr. Justice Peckham in the *Trono* case, therefore, not remotely because it upheld the accused's conviction of the greater offense, but because it did not go further and adopt the continuing jeopardy theory Mr. Justice Holmes had espoused in the *Kepner* case. If there was no double jeopardy for him when the Government appealed an acquittal, obviously there was none when the defendant appealed a conviction. Indeed, in *Kepner* he explicitly stated that he considered state cases that held the defendant could not be retried for the greater offense to be wrong.

Many statements by this Court since *Trono* show that the principle of that case cannot in all good conscience

be rested on the criminal procedure of the Philippine Islands, but on a construction of the Fifth Amendment itself, and as such binding on the entire federal judiciary. In *Burton* v. *United States,* 202 U. S. 344, 378, a case arising in the continental United States, the Court referred to the principle established by the *Trono* decision without any suggestion that it was confined to cases arising in the Philippines. In *Brantley* v. *Georgia,* 217 U. S. 284, the defendant was convicted of manslaughter under an indictment for murder. On appeal to the State Court of Appeals, the conviction was reversed and the defendant retried and convicted of murder. Although the case concerned the Due Process Clause, the Court comprehensively stated that this "was not a case of twice in jeopardy under any view of the Constitution of the United States." 217 U. S., at 285.

Of special relevance is *Stroud* v. *United States,* 251 U. S. 15, 17–18. In that case the defendant was indicted for murder, and the jury returned a verdict of "guilty as charged in the indictment without capital punishment." The judgment was reversed and a new trial had on which the defendant was again found guilty of murder, but without a recommendation against capital punishment. He was then sentenced to death. This Court expressly relied on *Trono* in affirming the judgment and rejecting the contention that the imposition of a greater punishment had placed the defendant twice in jeopardy. As a practical matter, and on any basis of human values, it is scarcely possible to distinguish a case in which the defendant is convicted of a greater offense from one in which he is convicted of an offense that has the same name as that of which he was previously convicted but carries a significantly different punishment, namely death rather than imprisonment.

Whatever formal disclaimers may be made, neither *Trono* itself nor the reliance placed upon it for more than

half a century permits any other conclusion than that the Court today overrules that decision. It does so, furthermore, in a case where the defendant's position is far less persuasive than it was in *Trono*. There the plaintiffs in error had been expressly acquitted of the greater offense, whereas in the present case petitioner relies on an "implied acquittal" based on his conviction of the lesser offense of second degree murder and the jury's silence on the greater offense. Surely the silence of the jury is not, contrary to the Court's suggestion, to be interpreted as an express finding that the defendant is not guilty of the greater offense. All that can with confidence be said is that the jury was in fact silent. Every trial lawyer and every trial judge knows that jury verdicts are not logical products, and are due to considerations that preclude accurate guessing or logical deduction. Insofar as state cases speak of the jury's silence as an "acquittal," they give a fictional description of a legal result: that when a defendant is found guilty of a lesser offense under an indictment charging a more serious one, and he is content to accept this conviction, the State may not again prosecute him for the greater offense. A very different situation is presented, with considerations persuasive of a different legal result, when the defendant is not content with his conviction, but appeals and obtains a reversal. Due regard for these additional considerations is not met by stating, as though it were a self-evident proposition, that the jury's silence has, for all purposes, "acquitted" the defendant.

Moreover, the error of the District Court, which was the basis for petitioner's appeal from his first conviction, was of a kind peculiarly likely to raise doubts that the jury on the first trial had made a considered determination of petitioner's innocence of first degree murder. By instructing on second degree murder when the evidence did not warrant a finding of such an offense, the court

gave the jury an opportunity for compromise and lenity that should not have been available. The fact of the matter is that by finding petitioner guilty of arson under count one of the indictment, and of second degree murder under count two, the jury found him guilty of all the elements necessary to convict him of the first degree felony murder with which he was charged, but the judge's erroneous instruction permitted the jury, for its own undisclosed reason, to render an irrational verdict.

We should not be so unmindful, even when constitutional questions are involved, of the principle of *stare decisis*, by whose circumspect observance the wisdom of this Court as an institution transcending the moment can alone be brought to bear on the difficult problems that confront us. The question in the present case is effectively indistinguishable from that in *Trono*. Furthermore, we are not here called upon to weigh considerations generated by changing concepts as to minimum standards of fairness, which interpretation of the Due Process Clause inevitably requires. Instead, the defense of double jeopardy is involved, whose contours are the product of history. In this situation the passage of time is not enough, and the conviction borne to the mind of the rightness of an overturning decision must surely be of a highly compelling quality to justify overruling a well-established precedent when we are presented with no considerations fairly deemed to have been wanting to those who preceded us. Whatever might have been the allowable result if the question of retrying a defendant for the greater offense were here for the first time, to fashion a policy *in favorem vitae,* it is foreclosed by the decision in *Trono* v. *United States.*

Even if the question were here for the first time, we would not be justified in erecting the holding of the present case as a constitutional rule. Yet the opinion of the Court treats the question, not as one within

our supervisory jurisdiction over federal criminal procedure, but as a question answered by the Fifth Amendment itself, and which therefore even Congress cannot undertake to affect.

Such an approach misconceives the purposes of the double jeopardy provision, and without warrant from the Constitution makes an absolute of the interests of the accused in disregard of the interests of society. In *Palko* v. *Connecticut,* 302 U. S. 319, we held that a State could permit the prosecution to appeal a conviction of second degree murder and on retrial secure a conviction of first degree murder without violating any "fundamental principles of liberty and justice." Since the State's interest in obtaining a trial "free from the corrosion of substantial legal error" was sufficient to sustain the conviction of the greater offense after an appeal by the State, it would of course sustain such a conviction if the defendant had himself appealed. Although this case defined conduct permissible under the Due Process Clause of the Fourteenth Amendment, it cannot wisely be ignored in tracing the constitutional limits imposed on the Federal Government. Nor should we ignore the fact that a substantial body of opinion in the States permits what today the Court condemns as violative of a "vital safeguard in our society." [4] The Court restricts Congress within limits

---

[4] Of the 36 States that have considered the question, 19 permit retrial for the greater offense:

Colorado.—See *Young* v. *People,* 54 Colo. 293, 298–307.

Connecticut.—See *State* v. *Lee,* 65 Conn. 265, 271–278; *State* v. *Palko,* 122 Conn. 529, 538–539, 541, aff'd 302 U. S. 319.

Georgia.—*Brantley* v. *State,* 132 Ga. 573, 574–579, aff'd 217 U. S. 284; *Perdue* v. *State,* 134 Ga. 300, 302–303.

Indiana.—See *Ex parte Bradley,* 48 Ind. 548, 549–558; *State ex rel. Lopez* v. *Killigrew,* 202 Ind. 397, 403–406.

Kansas.—*State* v. *McCord,* 8 Kan. 232, 240–244; see *In re Christensen,* 166 Kan. 671, 675–677.

that in the experience of many jurisdictions are not a part of the protection against double jeopardy or required by its underlying purpose, and have not been imposed

Kentucky.—*Hoskins* v. *Commonwealth,* 152 Ky. 805, 807–808.

Mississippi.—*Jones* v. *State,* 144 Miss. 52, 60–73, motion for leave to proceed *in forma pauperis* denied for want of substantial federal question, 273 U. S. 639 (citing *Trono* v. *United States*) ; *Butler* v. *State,* 177 Miss. 91, 100.

Missouri.—See *State* v. *Simms,* 71 Mo. 538, 540–541; *State* v. *Stallings,* 334 Mo. 1, 5.

Nebraska.—*Bohanan* v. *State,* 18 Neb. 57, 58–77, submission of cause set aside because of escape of plaintiff in error, 125 U. S. 692; *Macomber* v. *State,* 137 Neb. 882, 896.

Nevada.—*In re Somers,* 31 Nev. 531, 532–539; see *State* v. *Teeter,* 65 Nev. 584, 610.

New Jersey.—See *State* v. *Leo,* 34 N. J. L. J. 340, 341–342, 356.

New York.—*People* v. *Palmer,* 109 N. Y. 413, 415–420; *People* v. *McGrath,* 202 N. Y. 445, 450–451.

North Carolina.—*State* v. *Correll,* 229 N. C. 640, 641–642; see *State* v. *Matthews,* 142 N. C. 621, 622–623.

Ohio.—*State* v. *Behimer,* 20 Ohio St. 572, 576–582; *State* v. *Robinson,* 100 Ohio App. 466, 470–472.

Oklahoma.—*Watson* v. *State,* 26 Okla. Cr. 377, 379–390; see *Pierce* v. *State,* 96 Okla. Cr. 76, 79.

South Carolina.—See *State* v. *Gillis,* 73 S. C. 318, 319–324; *State* v. *Steadman,* 216 S. C. 579, 588–592.

Utah.—*State* v. *Kessler,* 15 Utah 142, 144–147.

Vermont.—See *State* v. *Bradley,* 67 Vt. 465, 472–474; *State* v. *Pianfetti,* 79 Vt. 236, 246–247.

Washington.—*State* v. *Ash,* 68 Wash. 194, 197–203; *State* v. *Hiatt,* 187 Wash. 226, 236.

In eight of these States, Indiana, Kansas, Kentucky, Nevada, New York, Ohio, Oklahoma, and Utah, this result is based to some extent on statutes defining the effect of granting a new trial. In four, Colorado, Georgia, Mississippi and Missouri, on special constitutional provisions that permit retrial for the greater offense. Connecticut, North Carolina, and Vermont have no constitutional provisions as to double jeopardy, but recognize the common-law prohibition.

In 17 States the defendant cannot be retried for the greater offense:

Alabama.—See *Thomas* v. *State,* 255 Ala. 632, 635–636.

Arkansas.—*Johnson* v. *State,* 29 Ark. 31, 32–46; see *Hearn* v. *State,* 212 Ark. 360, 361.

upon the States in the exercise of their governmental powers.

Undeniably the framers of the Bill of Rights were concerned to protect defendants from oppression and from

California.—*People* v. *Gilmore,* 4 Cal. 376; *People* v. *Gordon,* 99 Cal. 227, 228–232; *In re Hess,* 45 Cal. 2d 171, 175–176; but see *People* v. *Keefer,* 65 Cal. 232, 234–235; *People* v. *McNeer,* 14 Cal. App. 2d 22, 27–30; *In re Moore,* 29 Cal. App. 2d 56.

Delaware.—See *State* v. *Naylor,* 28 Del. 99, 114–115, 117.

Florida.—*State ex rel. Landis* v. *Lewis,* 118 Fla. 910, 911–916; see *McLeod* v. *State,* 128 Fla. 35, 37; *Simmons* v. *State,* 156 Fla. 353, 354.

Illinois.—*Brennan* v. *People,* 15 Ill. 511, 517–519; *People* v. *Newman,* 360 Ill. 226, 232–233.

Iowa.—*State* v. *Tweedy,* 11 Iowa 350, 353–358; *State* v. *Coleman,* 226 Iowa 968, 976.

Louisiana.—See *State* v. *Harville,* 171 La. 256, 258–262.

Michigan.—*People* v. *Farrell,* 146 Mich. 264, 266, 269, 272–273, 294; *People* v. *Gessinger,* 238 Mich. 625, 627–629.

New Mexico.—*State* v. *Welch,* 37 N. M. 549, 559; *State* v. *White,* 61 N. M. 109, 113.

Oregon.—*State* v. *Steeves,* 29 Ore. 85, 107–111; *State* v. *Wilson,* 172 Ore. 373, 382.

Pennsylvania.—*Commonwealth* v. *Deitrick,* 221 Pa. 7, 17–18; *Commonwealth* v. *Flax,* 331 Pa. 145, 157–158.

Tennessee.—See *Slaughter* v. *State,* 6 Humph. 410, 413–415; *Reagan* v. *State,* 155 Tenn. 397, 400–402.

Texas.—*Jones* v. *State,* 13 Tex. 168, 184–185; *Brown* v. *State,* 99 Tex. Cr. R. 19, 21–22; but see *Hill* v. *State,* 126 Tex. Cr. R. 79, 80–81; *Joubert* v. *State,* 136 Tex. Cr. R. 219, 220–221; *Beckham* v. *State,* 141 Tex. Cr. R. 438, 442; *Hall* v. *State,* 145 Tex. Cr. R. 192, 194; *Ex Parte Byrd,* 157 Tex. Cr. R. 595, 597–598.

Virginia.—*Stuart* v. *Commonwealth,* 28 Gratt. 950, 953–964; see *Taylor* v. *Commonwealth,* 186 Va. 587, 589–590, 592.

West Virginia.—See *State* v. *Franklin,* 139 W. Va. 43, 64.

Wisconsin.—*Radej* v. *State,* 152 Wis. 503, 511–513; but see *State* v. *B———,* 173 Wis. 608, 616–628; *State* v. *Witte,* 243 Wis. 423, 427–431; *State* v. *Evjue,* 254 Wis. 581, 586–592.

In two of these States, Virginia and Texas, the result is based to some extent on statutes prohibiting retrial for the greater offense, and in New Mexico on a constitutional provision to the same effect.

efforts to secure, through the callousness of repeated prosecutions, convictions for whose justice no man could vouch. On the other hand, they were also aware of the countervailing interest in the vindication of criminal justice, which sets outer limits to the protections for those accused of crimes. Thus if a defendant appeals his conviction and obtains a reversal, all agree, certainly in this country, that he may be retried for the same offense. The reason is, obviously, not that the defendant has consented to the second trial—he would much prefer that the conviction be set aside and no further proceedings had—but that the continuation of the proceedings by an appeal, together with the reversal of the conviction, are sufficient to permit a re-examination of the issue of the defendant's guilt without doing violence to the purposes behind the Double Jeopardy Clause. The balance represented by that clause leaves free another appeal to law. Since the propriety of the original proceedings has been called in question by the defendant, a complete re-examination of the issues in dispute is appropriate and not unjust. In the circumstances of the present case, likewise, the reversal of petitioner's conviction was a sufficient reason to justify a complete new trial in order that both parties might have one free from errors claimed to be prejudicial. As Mr. Justice Peckham pointed out in *Trono,* "the constitutional provision was really never intended to, and, properly construed, does not cover, the case of a judgment under these circumstances, which has been annulled by the court at the request of the accused . . . ." 199 U. S., at 534.

I would affirm the judgment.