[No. 55362–9. En Banc. January 12, 1989.]

THE STATE OF WASHINGTON, *Respondent,* v. SAMUEL DAVID DUNCAN, *Appellant.*

*Mestel & Muenster,* by *Peter Offenbecher,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Dean Lum* and *Cynthia Gannett, Deputies,* for respondent.

DORE, J.—We affirm a trial court's order reinstating an information charging first and second degree murder, which the trial court had previously dismissed on double jeopardy grounds. The defendant has no constitutional or statutory guaranty against prosecution for murders committed in this state, regardless of certain proceedings in Arkansas involving proof of the same accusations.

## FACTS

On April 20, 1984, Samuel David Duncan was charged by information with two counts of first degree murder in the deaths of William E. Hartley and Barbara A. Currier. He was not immediately apprehended and was never brought to trial on those charges.

Duncan escaped to Arkansas, where, on March 5, 1985, he was arrested for the murder of a Pine Bluff, Arkansas, police officer. Three days after his arrest, Duncan confessed to that killing. He was tried and convicted of capital murder at a jury trial.

Sentencing in Arkansas is governed by Arkansas Code Ann. § 5-4-602(3) (1987) (formerly Arkansas Crim. Code § 41-1301(3)), which requires a jury to hear evidence on

aggravating and mitigating circumstances at a separate sentencing hearing. If the jury finds aggravating circumstances beyond a reasonable doubt, the death penalty may be imposed. Arkansas Code Ann. § 5–4–603(a). Aggravating circumstances are defined to include the previous commission of another felony involving the use or threat of violence, Arkansas Code Ann. § 5–4–604(3), and the commission of capital murder for the purpose of avoiding arrest or escaping from custody. Arkansas Code Ann. § 5–4–604(5). The jury at Duncan's sentencing hearing found that both of these aggravating circumstances existed, and he was sentenced to death. Supplemental Clerk's Papers, at 144–49.

The evidence at Duncan's sentencing hearing consisted of proof of the outstanding Washington murder charges, on the theory that this constituted the previous commission of a violent felony. Arkansas law does not require proof of conviction, only proof of "commission", so long as the commission of the previous felony is proved beyond a reasonable doubt. *Miller v. State*, 280 Ark. 551, 660 S.W.2d 163, 165 (1983). Arkansas called as witnesses Dr. Donald Reay, King County Chief Medical Examiner; Ricky Tucker, allegedly the last person to see Hartley and Currier alive and in the company of Duncan; and John Boren, Jim Yoshida and Dwayne Homan, all Seattle police detectives, who investigated the deaths of Hartley and Currier. Arkansas also called Mack Cook, Pine Bluff Police Department detective, who tape–recorded statements by Duncan implicating him in the Seattle murders.

The sentencing hearing was conducted in a manner that resembles a criminal trial. Counsel made opening and closing statements, introduced evidence under rules of evidence and cross–examined witnesses. The jury was instructed in the applicable law which included the reasonable doubt standard. Supplemental Clerk's Papers, at 158–60.

Following Duncan's conviction and sentencing in Arkansas, he was returned to Washington to stand trial for the Hartley and Currier murders. The information was

amended to charge aggravated murder in the second degree for Hartley and aggravated murder in the first degree for Currier. Supplemental Clerk's Papers, at 5–6.

Duncan pleaded not guilty and moved to dismiss the information, claiming double jeopardy. Duncan argued that the sentencing proceedings in Arkansas had subjected him to jeopardy for the Washington murders. The trial court agreed, granted Duncan's motion and dismissed the information with prejudice. Supplemental Clerk's Papers, at 158–64. The State appealed this ruling.

Meanwhile, the Arkansas Supreme Court reversed Duncan's conviction for the police officer's murder, on the ground that Arkansas had unnecessarily delayed bringing Duncan before a magistrate and had not obtained an adequate waiver of Duncan's Sixth Amendment right to counsel. The case was remanded for retrial. In his Arkansas appeal, Duncan also argued that the Arkansas trial court erred in permitting proof of the Washington murders in sentencing. In remanding the case, the Arkansas Supreme Court noted this argument, and said:

> Duncan had announced in open court that he would waive extradition to Washington to be tried on charges pending against him for the murders of Barbara Currier and William Hartley. The prosecutor refused to relinquish custody of Duncan and the trial court declined to order it. Duncan argues that he was thereby deprived of the opportunity to vindicate himself of those charges so that they could not be used against him. He contends the statute is unconstitutional on its face or at least as applied.
>
> We need not settle the issue, admittedly a troubling one where the defendant's guilt is still undetermined, because appellant's brief tells us parenthetically that Duncan is now in Washington awaiting trial on the pending charges.

Brief of Appellant app., at 21–22.

Based on the action of the Arkansas Supreme Court, the State moved to dismiss its appeal of the original order of

dismissal and for permission to obtain postjudgment modification in the trial court pursuant to RAP 7.2(e). That motion was granted and the State moved in the trial court for relief from the order of dismissal, pursuant to CrR 7.8(b)(5). The trial court granted the State's motion. The trial court reasoned that the terms on which the Arkansas Supreme Court remanded the Arkansas case precluded the use of the Washington charges in sentencing Duncan in Arkansas, should he be convicted on retrial. This, the court felt, cured the double jeopardy problem.

> Although the Arkansas Supreme Court's opinion could have been much clearer, a reasonable trial judge would read the opinion to prohibit the introduction of the Washington murders in the penalty phase of the Arkansas trial until after Duncan is tried in Washington. Therefore, no double jeopardy prohibition exists, as the situation is analogous to a "continuing jeopardy" situation after a reversal on appeal due to trial error and remand to the lower court for a new trial.

Clerk's Papers, at 23; "Findings of Fact and Conclusions of Law on Second Motion for Reconsideration". Following the trial court's denial of his motion to reconsider, Duncan instituted this appeal. The order which is presently before this court is the trial court's order under CrR 7.8(b)(5) vacating its previous order of dismissal.

## ISSUES

Three principal issues are presented: (1) Did the trial court have the power to vacate its order of dismissal; (2) Does the United States Constitution prohibit Washington from prosecuting Duncan for the Hartley and Currier murders; and (3) Does RCW 10.43.040 prohibit Washington from prosecuting Duncan for the murders of Hartley and Currier?

## THIS COURT GRANTED THE TRIAL COURT THE POWER TO VACATE ITS ORDER OF DISMISSAL

Duncan argues first that, aside from the question whether he is now subject to double jeopardy, the trial

court lacked the authority to vacate the original order of dismissal.

The trial court vacated its prior dismissal of the information under the authority of CrR 7.8(b)(5). That rule provides:

> **(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud; etc.** On motion and upon such terms as are just, the court may relieve a party from a final judgment, order, or proceeding for the following reasons:
>
> . . .
>
> (5) Any other reason justifying relief from the operation of the judgment.

The trial court felt the terms under which the Arkansas Supreme Court remanded Duncan's case cured the double jeopardy problem. The trial judge cited these "changed circumstances" as justification for vacating the previous order under subsection (5).

Duncan argues that "changed circumstances" such as those involved here do not fall under that catchall provision. He notes that, prior to the adoption of CrR 7.8(b), relief from final judgments and orders in criminal cases was governed by CR 60(b). *State v. Scott*, 92 Wn.2d 209, 212, 595 P.2d 549 (1979). The civil rule sets out a broader range of grounds for vacating prior judgments than CrR 7.8(b) does, because the drafters of the criminal rule selectively incorporated only some of the civil rule's grounds. One of the grounds specified in CR 60(b) which was *not* incorporated into CrR 7.8(b) is CR 60(b)(6). That subsection provides:

> (6) The judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application[.]

Duncan argues that the trial judge vacated his previous order of dismissal because "a prior judgment upon which it is based has been reversed . . ." CR 60(b)(6). Since this ground was not incorporated into CrR 7.8(b), however,

Duncan concludes that it is not a proper ground for dismissal in this case. He contends that the omission indicates an intent to exclude that ground from CrR 7.8(b), citing *General Tel. Co. of the Northwest, Inc. v. Utilities & Transp. Comm'n,* 104 Wn.2d 460, 470, 706 P.2d 625 (1985).

■ We need not reach this issue.[1] The trial court had authority to vacate its previous order and reinstate the information, because it was granted that authority by this court. The record reflects that the State moved in this court for permission for postjudgment modification under RAP 7.2(e). That rule provides in part:

> **(e) Postjudgment Motions and Actions To Modify Decision.** The trial court has authority to hear and determine (1) postjudgment motions authorized by the civil rules, the criminal rules, or statutes, and (2) actions to change or modify a decision that is subject to modification by the court that initially made the decision. If the trial court determination will change a decision then being reviewed by the appellate court, the permission of the appellate court must be obtained prior to the entry of the trial court decision. A party should seek the required permission by motion. The decision granting or denying a postjudgment motion may be subject to review.

In accordance with the rule, the State made its motion under RAP 7.2(e) after the trial court had determined that it would grant the requested modification—the vacation of

---

[1]In any event, Duncan's interpretation of CrR 7.8(b) is unnecessarily restrictive. To follow the general rule of statutory construction in this case would be overly formalistic. What reason would the drafters of the criminal rules have had for positively ruling out the vacation of an order in a criminal case on the ground that a predicate judgment had been reversed? What policy would such a rule serve?

The general rule simply reads too much into the omission of CR 60(b)(6) from CrR 7.8(b). The main concern of the drafters of CrR 7.8(b) was obviously to incorporate those parts of CR 60(b) that seemed relevant to criminal cases. A case such as this one—where a judgment in a criminal case rests on a predicate judgment—is unusual, and the incorporation of CR 60(b)(6) into CrR 7.8(b) may have seemed unnecessary. It does not follow that such incorporation is necessarily improper. There is no substantive reason in law or policy to conclude that an order in a criminal case cannot be vacated, under the catchall provision of CrR 7.8(b)(5), where a judgment on which it is based has been reversed.

its previous order dismissing the information. The State's motion was granted by this court's Commissioner in an order dated July 1, 1987.

The order granting the State's motion under RAP 7.2(e) granted the trial court the power to vacate its previous order of dismissal, regardless of the applicability of CrR 7.8(b)(5). Since the State satisfied the requirements of RAP 7.2(e), we need not consider whether it satisfied CrR 7.8(b)(5).

Counsel for Duncan contended at oral argument that the State must satisfy both RAP 7.2(e) and CrR 7.8(b)(5). In other words, he argued that the Commissioner's order under RAP 7.2(e) gave the trial court permission to *consider* whether to vacate its previous order under CrR 7.8(b), but that the Commissioner's order gave the trial court no power, independent of the criminal rules, to do so. We reject this interpretation of RAP 7.2(e) because it ignores the inherent power of this court to ensure orderly review.

At the time the State sought permission from this court to obtain postjudgment relief in the trial court, the trial court had already indicated its willingness to vacate its previous order of dismissal; a procedure required by the terms of RAP 7.2(e). The question faced by the Commissioner in considering the motion under RAP 7.2(e) was whether the issues in this case would best be presented by the State's original appeal or by the inevitable appeal of the trial court's order vacating the previous order of dismissal.

Consider the consequences of denying the State's RAP 7.2(e) motion. The State's initial appeal would have gone forward. However, the action of the Arkansas Supreme Court obviously affected the double jeopardy question; in fact it completely changed the premise of the State's initial appeal. At some point the State necessarily would have brought the reversal of the conviction in Arkansas to this court's attention, probably by amending its notice of appeal. RAP 5.3(h). This amendment would have required revisions and additions to the record, so as to permit this court to judge the effects of the Arkansas ruling on the trial

court's initial ruling on the double jeopardy question. At that point this court would have been in the position of considering a question completely different from that decided by the trial court, probably on an inadequate record.

Faced with such an alternative, it is clear that the orderly way to proceed was to permit the trial court to rule on the new issues raised by the action of the Arkansas court, and then to review that decision. This court has the inherent power to ensure orderly review, a power stated expressly in RAP 7.3 and 8.3. That same power is implicit in RAP 7.2(e), which permits us to obtain the benefit of the trial court's ruling after appeal has been taken on matters which ordinarily would no longer be within its jurisdiction. RAP 7.2(a). The exercise of that power was necessitated by the unusual circumstances of this case, and the State proceeded properly in making its motion. We conclude that the trial court had the power to vacate its previous order of dismissal.

### There Is No Constitutional Double Jeopardy

The Fifth Amendment provides: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . ." The prohibition on double jeopardy applies to the states by way of the due process clause of the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 23 L. Ed. 2d 707, 89 S. Ct. 2056 (1969).

The prohibition on double jeopardy does not just preclude multiple punishment for a single crime; it prohibits multiple prosecutions. The theory is that the defendant should not be put through the ordeal of accusation and trial more than once.

> The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him

to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187–88, 2 L. Ed. 2d 199, 78 S. Ct. 221, 61 A.L.R.2d 1119 (1957).

▮ It is well established that the double jeopardy clause does not bar prosecutions by *different states* for the same acts. Since each state is a separate sovereignty, each state is free to punish the violation of its own laws. *Heath v. Alabama,* 474 U.S. 82, 88 L. Ed. 2d 387, 106 S. Ct. 433 (1985); *Abbate v. United States,* 359 U.S. 187, 3 L. Ed. 2d 729, 79 S. Ct. 666 (1959). This court has previously recognized this principle in *State v. Rudy,* 105 Wn.2d 921, 924, 719 P.2d 550 (1986); *State v. Caliguri,* 99 Wn.2d 501, 511, 664 P.2d 466 (1983); and *State v. Roybal,* 82 Wn.2d 577, 512 P.2d 718 (1973).

Therefore, even assuming that Arkansas will use the Washington charges in sentencing Duncan (should he be convicted on remand in the Arkansas prosecution) and assuming that that use would constitute double jeopardy, he nevertheless has no constitutional protection against prosecution in Washington. The clause simply does not bar parallel state prosecutions.

## RCW 10.43.040 Is Not Applicable to This Case

Washington has granted protection against double jeopardy in multiple jurisdictions by statute. RCW 10.43.040 provides:

> Whenever, upon the trial of any person for a crime, it appears that the offense was committed in another state or country, under such circumstances that the courts of this state had jurisdiction thereof, and that the defendant has already been acquitted or convicted upon the merits, upon a criminal prosecution under the laws of such state or country, founded upon the act or omission with respect to which he is upon trial, such former acquittal or conviction is a sufficient defense.

Duncan argues that RCW 10.43.040 applies to bar his prosecution for the murders of Hartley and Currier, because Arkansas has attempted to prove those charges during the sentencing phase of his trial for the murder of the Arkansas police officer and because, on remand, Arkansas may attempt to prove those charges again.

This contention raises several issues, among them whether the terms of the Arkansas court's remand eliminate any possibility of double jeopardy and whether the proof of enhancing factors in Arkansas constitutes "criminal prosecution" of an offense within the terms of the statute. We need not reach those issues, however. We hold that Duncan is not entitled to the protection of RCW 10.43.040 because he is not being prosecuted for the same "act or omission" in Arkansas and Washington, as that statutory term has been defined.

In *State v. Caliguri,* 99 Wn.2d 501, 664 P.2d 466 (1983), the defendant was convicted in federal court of racketeering, based in part on a conspiracy to commit arson. He was later charged in state court with conspiracy to commit arson and conspiracy to commit murder. The court held that RCW 10.43.040 barred the state prosecution for conspiracy to commit arson, since that charge had actually been tried and proven as a predicate to the federal racketeering charge.

However, the conspiracy to commit murder charge was upheld against the same challenge because RCW 10.43.040 prohibits multiple prosecutions for the same "act or omission." The act of conspiring to commit murder, the court held, was not the same act as racketeering.

> That charge [conspiracy to commit murder] required proof of an act of a different character; namely, arson committed with the premeditated intent to cause a particular individual's death. We construe "act" as defined in RCW 10.43.040 to include the mental state accompanying it.

*Caliguri,* at 514.

This strict reading of the term "act" in the statute was reinforced in *State v. Rudy*, 105 Wn.2d 921, 719 P.2d 550 (1986). There, defendant kidnapped the wife and children of a banker and attempted to extort money from the bank by holding them hostage. Rudy was convicted in federal court for interference with commerce by threats or violence under 18 U.S.C. § 1951 (1982) (Hobbs Act). The State then charged Rudy with three counts of kidnapping in the first degree with intent to inflict extreme emotional distress, RCW 9A.40.020(1)(d), based on the same occurrence.

This court held that the State prosecution was not barred by RCW 10.43.040 because the State had not charged Rudy with the same "act" as the United States had—despite the fact that the charges in both jurisdictions were based on the same events.

> To prove the charge of first degree kidnapping, the State would have to show that Rudy intentionally abducted another person with intent to inflict extreme mental distress on a third person. RCW 9A.40.020(1)(d). The federal government would not, in fact, have had to prove abduction or intent to inflict mental distress in order to prove the Hobbs Act violation. . . . Thus, the kidnapping charge required proof of acts of a different character than would have been used to prove the federal charge.

*Rudy*, at 928.

The strict interpretation of the term "act" in *Caliguri* and *Rudy* leads to the conclusion that Arkansas did not prosecute Duncan for the same act as Washington has charged. He is therefore not protected from double jeopardy by that statute.

In the sentencing phase, Arkansas was required to prove aggravating circumstances, defined as follows:

> (3) The person previously committed another felony, an element of which was the use or threat of violence to another person or the creation of a substantial risk of death or serious physical injury to another person[.]
>
> . . .
>
> (5) The capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody[.]

Arkansas Code Ann. § 5–4–604(3), (5) (1987) (formerly Arkansas Crim. Code § 41–1303(3), (5)).

Washington has charged Duncan with aggravated first degree murder in the death of Currier and second degree murder in the death of Hartley. Murder in the first degree is defined as causing the death of another person with premeditated intent. RCW 9A.32.030(1)(a). The aggravating factor charged in the death of Currier was the commission of the murder to conceal the commission of a crime, namely the murder of Hartley. RCW 10.95.020(7). Murder in the second degree is defined as causing the death of another person without premeditation, but with intent or in the course of committing another felony. RCW 9A.32.050(1)(a), (b).

Under RCW 10.43.040, none of the acts charged are the same acts charged in the sentencing proceeding in Arkansas. Therefore, Duncan is not entitled to protection against double jeopardy under that statute.

CONCLUSION

The trial court had the authority to vacate its order of dismissal because this court granted it that authority in order to ensure orderly review. The trial court's decision to vacate was proper because neither the constitution nor RCW 10.43.040 prohibits the State from trying Duncan for the murders of Hartley and Currier. The trial court's order is affirmed.

CALLOW, C.J., and UTTER, BRACHTENBACH, DOLLIVER, PEARSON, ANDERSEN, DURHAM, and SMITH, JJ., concur.