STATE of Wisconsin, Plaintiff-Respondent,

v.

Otis G. MATTOX, Defendant-Appellant.

Court of Appeals

*No. 2005AP936–CR. Oral argument January 3, 2006.
—Decided May 16, 2006.*

2006 WI App 110

(Also reported in 718 N.W.2d 281.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Scott D. Obernberger* of *Obernberger & Associates, LLC*, of Milwaukee, with oral argument by *Scott D. Obernberger*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Maura F.J. Whelan*, assistant attorney general, with oral argument by *Maura F.J. Whelan*.

¶ 1. CURLEY, J. Otis G. Mattox appeals a nonfinal order denying his motion to dismiss the criminal charge of first-degree reckless injury while armed with a dangerous weapon, contrary to Wis. Stat. §§ 940.23(1)(a) and 939.63(1)(2) (2003–04),[2] on double jeopardy grounds. Mattox submits that the trial court's reasons for declaring a mistrial over his and the State's objections did not rise to the level of a manifest necessity,

---

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

and, if he were to be retried, it would be a violation of his rights under the Fifth Amendment to the United States Constitution and article I, section 8 of the Wisconsin Constitution against double jeopardy. We agree and reverse the trial court's order.

## I. BACKGROUND.

¶ 2. According to the criminal complaint, on the evening of May 9, 2004, Maddox was at the residence of Roy Johnson, whom Maddox had known for years. A physical altercation ensued between Mattox and Johnson after Mattox referred to Johnson's girlfriend, Rhonda Jones, as a "bitch." During the fight, Mattox pulled out a kitchen knife and stabbed Johnson repeatedly. The altercation ended when Jones hit Mattox on the head with a hard object. After the police arrived, Mattox was arrested and subsequently charged with one count of first-degree reckless injury, while armed with a dangerous weapon. Mattox pled not guilty and Attorney Michael Schnake was appointed to represent him.

¶ 3. On September 7, 2004, Schnake filed a motion to exclude testimony based on the State's lack of response to Schnake's June 30, 2004, request that the State provide "any reports on prior no process cases regarding Mr. Roy Johnson and Ms. Rhonda Jones." The following day, the day on which a jury trial was to begin, a *Miranda-Goodchild*[3] hearing was held. At the hearing, Schnake alleged that the State had failed to respond to his request to provide information about any prior, uncharged contact Johnson or Jones had with police. Schnake argued this was a sufficient reason for

[3] *See Miranda v. Arizona*, 384 U.S. 436 (1966); *State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 133 N.W.2d 753 (1965).

excluding testimony from both Johnson or Jones. Schnake was primarily concerned with the potential testimony of Jones. Following a lengthy debate between Schnake, the prosecutor, and the trial court over the legal basis for the request, the trial court denied Schnake's discovery motion, motion to exclude testimony and alternative motion for adjournment of the trial.

¶ 4. Schnake renewed his objection to the judge's ruling on the discovery motion immediately prior to the voir dire panel's entry into the courtroom. After the jury was impaneled, Schnake renewed his objection once more, stating that there may be both *McMorris* and *Whitty* evidence involving Jones.[4] Again, there ensued a lengthy debate over whether Schnake had established sufficient legal grounds for his objections. The prosecutor indicated that he did not intend to call Jones either in his case-in-chief or as a rebuttal witness, and such debate was unnecessary. The prosecutor also indicated that he had not been uncooperative with Schnake in regards to his discovery requests. The court agreed that this debate was irrelevant because Schnake could have obtained the prior contact information on his own, and barred Schnake from further discussion about discovery, stating: "[I]f I hear about it one more time, I'm going to find you in contempt." Prior to Schnake's opening statement, he was again reminded not to mention the discovery dispute.

¶ 5. During his opening statement, Schnake showed the jury enlarged Milwaukee Police Department booking photos of Johnson and Jones. He later made reference to evidence "regarding prior convictions

---

[4] *See McMorris v. State*, 58 Wis. 2d 144, 205 N.W.2d 559 (1973); *Whitty v. State*, 34 Wis. 2d 278, 149 N.W.2d 557 (1967).

of [Jones] . . . ." This caused the trial court to halt the opening statement and call a sidebar. At sidebar, the judge reprimanded Schnake for his conduct and terminated his opening statement. At that point, both the appellant and the defense indicated a desire to continue with the trial and no request for a mistrial was made.

¶ 6. The trial continued, and during Schnake's cross-examination of Johnson, the jury was excused when Schnake inquired about *Morris*-type evidence of reputation. Schnake had referenced the potential existence of *McMorris* evidence, but had never formally made an offer of proof. The court ruled the line of questioning improper, and thus inadmissible, because Schnake had not moved for the admission of such evidence prior to trial. Again, the court reprimanded Schnake for "playing games," and precluded him from mentioning *McMorris* evidence in the future.

¶ 7. The last State witness to testify was Detective John Karlovich, who had interviewed Mattox following the altercation with Johnson. Prior to Schnake's cross-examination of Karlovich, the trial court denied Schnake permission to inquire as to whether Karlovich had been disciplined, absent a good faith basis for such an inquiry. The court warned that if Schnake violated the court's order, he would be taken into custody. On re-direct examination, the prosecutor asked Karlovich if he would be demoted or admonished if a person he interviewed gave a statement supporting a self-defense theory. On re-cross examination, Schnake asked about demotions, and specifically, whether Karlovich had ever been demoted on the job. The court excused the jury and stated that Schnake's question amounted to "contemptuous and influent [sic] behavior" which "seriously destroyed the order, authority, and dignity of th[e] Court . . . ." Schnake stated that he had not intended to

"disrespect your Honor," but rather had asked the question in response to the prosecutor's earlier inquiries about demotions. The court found Schnake in contempt of court.[5]

¶ 8. Counsel was appointed for Schnake and new counsel was appointed for Mattox. Mattox and Schnake, through their respective counsel, as well as the prosecutor, all expressed their desire to continue the trial, despite the court's finding of contempt. The court disagreed and explained that although the court thought the jury could decide the case either way, a mistrial was necessary for several reasons: (1) if convicted, Mattox's conviction would probably be overturned on appeal because of Mattox's attorney's ineffectiveness, as evidenced by his contemptuous behavior; (2) continuing the trial would subject the trial court to accusations of being vindictive, and the court did not want either "to put [it]self in a position to bend over backwards to rule" in Mattox's favor or be "strongarmed into trying to resolve every dispute in the defendant's favor"; (3) the trial court would be accused of being unfair and impartial, and the trial court felt that continuing on with the trial would reflect poorly on its reputation, as it believed it had a reputation for being "extremely fair and impartial in all its dealings"; and (4) continuing the trial would not be in Mattox's or anyone else's best interest.

¶ 9. Following the mistrial, Mattox filed a motion to dismiss on double jeopardy grounds. The trial court held a hearing on the motion and took the matter under

---

[5] Schnake later appealed the finding of contempt, and this court reversed, concluding that Schnake's questioning was not contemptuous as a substantive matter. *See Schnake v.* Circuit Ct. for Milw. County, No. 04–2471, unpublished slip op. (WI App May 17, 2005).

advisement. Several weeks later, and some six months after the mistrial was called, the trial court gave its decision in open court denying the motion. In denying the motion, the trial court explained that there would have been an appearance of unfairness if the court had to rule against Schnake for the remainder of the case, and, for the first time, the trial court suggested that Schnake's behavior had prejudiced the jury against Mattox, thereby creating a manifest necessity for the mistrial. Mattox now appeals the denial of his motion to dismiss.

## II. ANALYSIS.

¶ 10. Mattox submits that the trial court erroneously exercised its discretion when, sua sponte, it declared a mistrial.

> The trial court's exercise of discretion in making this sua sponte determination is ordinarily entitled to considerable deference on review by an appellate court. *Gori v. United States*, 367 U.S. 364 (1961). This is because the unusual prejudicial development resulting in mistrial is of a type whose effect is best assessed by the trial court's first-hand observation. It is appropriately left to the exercise of trial court discretion; and on review the test is whether, under all the facts and circumstances, giving deference to the trial court's first-hand knowledge, it was reasonable to grant a mistrial under the "manifest necessity" rule.

*State v. Copening*, 100 Wis. 2d 700, 709 10, 303 N.W.2d 821 (1981).

¶ 11. Both the Fifth Amendment to the United States Constitution and article I, section 8 of the Wisconsin Constitution protect an accused from being

placed in jeopardy twice for the same offense.[6] As explained in *State v. Moeck*, 2005 WI 57, ¶ 35, 280 Wis. 2d 277, 695 N.W.2d 783, "[u]nderlying the protection against cumulative trials are the principles of fairness and finality."

> "The underlying idea, one that is deeply ingrained . . . is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

*Id.* (quoting *Green v. United States*, 355 U.S. 184, 187 88 (1957)) (footnote omitted). "Courts have recognized that the double jeopardy protection may be subverted if a circuit court terminates a trial prior to verdict, thereby taking from an accused the opportunity to gain an acquittal when the prosecution has been less persuasive than anticipated." *Id.* (footnote omitted).

¶ 12. "Jeopardy" in this context "means exposure to the risk of determination of guilt." *State v. Comstock*, 168 Wis. 2d 915, 937, 485 N.W.2d 354 (1992). It attaches in a jury trial when the selection of the jury has been completed and the jury is sworn. *Id.* Consequently, the

---

[6] The Fifth Amendment to the United States Constitution provides: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ." Article I, section 8 of the Wisconsin Constitution provides that, "no person for the same offense may be put twice in jeopardy of punishment . . . ." In construing Wisconsin's protection against double jeopardy, we are guided by the rulings of the United States Supreme Court. *State v. Barthels*, 174 Wis. 2d 173, 181, 495 N.W.2d 341 (1993).

848

protection against double jeopardy includes a defendant's "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689 (1949); *Washington*, 434 U.S. at 503. However, there are circumstances when a new trial may be conducted once a mistrial has been declared. "Once jeopardy attaches, prosecution of a defendant before a jury other than the original jury, excluding any contemporaneously empanelled and sworn alternates, is barred unless: (1) there is a 'manifest necessity' for a mistrial; or (2) the defendant either requests or consents to a mistrial." *Watkins v. Kassulke*, 90 F.3d 138, 141 (6th Cir. 1996).

¶ 13. The doctrine of manifest necessity was established in *United States v. Perez*, 22 U.S. (9 Wheat.) 579 (1824), where the court held that a trial court could declare a mistrial when "taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *Id.* at 580 (quoted by *State v. Barthels*, 174 Wis. 2d 173, 183, 495 N.W.2d 341 (1993); *Copening*, 100 Wis. 2d at 709). This tool should be used only "with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Id.* A court must find a "high degree" of necessity before concluding that a mistrial is appropriate. *Washington*, 434 U.S. at 506.

¶ 14. We first observe that the trigger for the mistrial was the contempt finding leveled against Mattox's trial attorney, as the mistrial was declared shortly after the contempt finding was made.

> THE COURT: What happened—just so that the record is clear for you, [Attorney for Schnake]—is that

849

at the beginning of the proceedings this morning, Mr. Schnake indicated to me his intention of asking questions of Detective Karlovich about all of his prior experiences, both professional and personal relating to possible disciplinary actions and possible demotions and anything else that may have come up in the course of his tenure at the Milwaukee Police Department.

And I told him very clearly at that time that that would not be tolerated by the Court unless he can show me by an offer of proof that Detective Karlovich had been in any way demoted or disciplined by the Milwaukee Police Department. He told me he had no such information, and I said that those questions are not to be asked, because just by asking those questions puts in the minds of the jury that there's a possibility that there's a problem. And I ordered him specifically not to do that.

I then went on to tell Mr. Schnake that if you violate my order, you will be found in contempt, and you will be jailed. The reason why I did that is because Mr. Schnake throughout the course of this trial has violated numerous court orders. And I've given him opportunities to apologize, to purge himself of those violations, and I have not up until now made a finding of contempt.

Then in the course of re-cross of Detective Karlovich, Mr. Schnake asked Detective Karlovich whether he's ever been demoted in his job in specific violation of the Court's order.

However, as this court observed in the opinion reversing the trial court's contempt finding, Schnake properly questioned the detective after the door was opened by the State:

This line of questioning, addressed as it was to motive, is wholly different from what the trial court had earlier forbidden: asking about whether Karlovich had been

850

disciplined, in order to imply from the mere asking of the question that Karlovich had a bad work record as a police officer and was, therefore, a less-then-credible witness. The latter line of inquiry was improper; what Schnake actually asked before he was held in summary contempt was not.

. . . .

The question for which the trial court held Schnake in contempt was not, in its context, contempt; it was both consistent with Mattox's legitimate theory of defense, and was also a proper response to the prosecutor's immediately preceding questions on re-direct . . . .

*Schnake v. Circuit Ct. for Milw. County*, No. 04 2471, unpublished slip op., ¶¶ 9, 13 (WI App May 17, 2005). Consequently, the trial court erred as a matter of law in its assessment that Mattox's attorney engaged in contemptible behavior, inasmuch as no contemptible act occurred. Thus, the contempt finding cannot be considered to have created a manifest necessity prompting a mistrial. Additionally, nowhere in the trial court's initial comments do we find any mention of the words "manifest necessity" or any equivalent wording that would require a mistrial over Mattox's (and the prosecutor's) objections. Indeed, the trial court did not appear to be judging the decision to grant a mistrial sua sponte against any legal test.

¶ 15. Moreover, our review of the trial court's initial explanation for the mistrial does not reveal a reason which rises to the level of a manifest necessity. The trial court's concern that if Mattox was convicted, there was a "ninety percent" chance that the case could be overturned on appeal because of his attorney's ineffectiveness, does not meet the *Perez* test of manifest

necessity being a "very plain and obvious cause." First, as noted, the trial court premised its finding on its belief that Schnake had engaged in a contemptible act when he had not. Second, without the mistaken contempt finding, we infer from the fact that the trial court declined to find Schnake in contempt earlier, that Schnake's earlier missteps prior to the finding of contempt did not rise to the level of being contemptible. We also cannot find that the trial court's concern about its reputation qualifies as a manifest necessity. We are mindful that the trial court felt it was being placed in an awkward situation. However, the trial was close to a conclusion. The last of the State's witnesses was on the stand when the mistrial was announced. It appears as though the only remaining witness was Mattox himself. The trial court could have easily completed the trial without having to "bend over backwards" for Mattox's attorney or be exposed to a charge of vindictiveness. Indeed, while it may have been unpleasant to preside over the trial under the existing conditions, we cannot conclude that being perceived as "looking bad" is a manifest necessity. Although there is one sentence in the three pages of the transcript explaining the trial court's decision to call a mistrial, where the trial court stated that the mistrial was in "Mattox's best interest," the trial court never explained why this was true.[7]

[7] We would be remiss if we did not comment on the conduct of Mattox's defense attorney. Although Attorney Schnake escaped the trial court's finding of contempt, his behavior in the trial was, at best, very peculiar. After reviewing the record, we cannot determine if his aggressive and repeated arguments on certain issues and his extraordinary act of showing the jurors in his opening statement enlarged booking photos of the victim and his girlfriend was the result of his wayward belief that he

Thus, our review of the record made at the time of the mistrial reveals no manifest necessity.

¶ 16. We have also reviewed the trial court's decision denying Mattox's motion seeking dismissal of the charge on double jeopardy grounds. In this oral decision, given some six months after the mistrial was declared, the trial court correctly identified that the test for allowing a retrial was whether a manifest necessity existed at the time the mistrial occurred. The trial court reiterated that there would have been an "appearance of unfairness" had the trial court ruled against Mattox's attorney. The trial court then went on to say, for the first time, that the mistrial was occasioned by Schnake, who had so "prejudiced the jury with his actions" that Mattox "would have a very difficult time in receiving a fair trial." The trial court also backtracked from its earlier comments and rejected the idea that its decision had anything to do with the court personally. The trial court advised that its concern for Mattox was the sole reason why the court decided to bring the trial to an end.

¶ 17. While the trial court may have come to believe, with the benefit of hindsight, that its only reason for declaring a mistrial was to preserve Mattox's rights, its later analysis clashes, and in some instances actually contradicts the reasons given at the time the mistrial was declared. As noted, at the time of the mistrial, one of the trial court's concerns was that if Mattox were convicted, the conviction might be overturned on ineffective assistance of counsel grounds. The thought that Mattox, if convicted, might appeal on ineffective assistance of counsel grounds, and that this

was zealously defending his client or due to innocent ignorance. In any event, it is for others to determine whether a reprimand is appropriate.

court would agree with him and overturn the verdict, is an insufficient reason for declaring a mistrial.

¶ 18. The trial court's later statement that jury prejudice against Mattox resulting from his attorney's conduct was the underpinning for the mistrial, is inconsistent with its contemporaneous statements. At the time the mistrial was ordered, there was no mention of the jury having been prejudiced by Schnake's actions. We note that most of Schnake's transgressions were done outside the jurors' presence. Further, there is no evidence here supporting the trial court's later conclusion. Unlike the situation existing in *United States v. Spears*, 89 F. Supp. 2d 891 (W.D. Mich. 2000), where the trial court sua sponte declared a mistrial after the trial court noticed signs of juror exasperation with the defense attorney by "raising their eyes, shaking their heads negatively," and individual voir dire revealed bias against the defendant due to his counsel's actions, see *id.* at 895, here we have no indication of juror bias. Indeed, the trial court commented at the time that, "[t]his case could very easily turn out to be an acquittal," and earlier stated that "he may very well not get convicted . . . ." Thus, it would appear that earlier, contrary to the court's later comments, the trial court did not think that the jurors had been negatively influenced by Schnake's behavior.

¶ 19. As noted, the chief concerns of the trial court in continuing the trial were the problems occasioned by Schnake being found in contempt, and the concern that charges of vindictiveness would be lodged against the trial court and the court would have to bend over backwards for Mattox's attorney in order to avoid a charge of impartiality and unfairness. However, the trial court was mistaken about the contempt, and we have determined that any concern about its reputation

854

did not constitute manifest necessity. [8] Thus, we are left with only one conclusion—no manifest necessity existed requiring a mistrial over the objections of both the State and Mattox. Consequently, the trial court erroneously exercised its discretion in terminating the trial because the trial court erred as a matter of law in its finding of contempt, and no other stated reasons rose to the level of a manifest necessity. Under these circumstances, Mattox's exercise of his constitutional rights prevents a retrial. Accordingly, we reverse.

*By the Court.*—Order reversed.

---

[8] While we acknowledge that other reasons were proffered later by the trial court for its decision, we are satisfied that the analysis given at the time of the mistrial trumps later explanations, particularly when the new explanations contradict what was said at the time the mistrial was declared.