NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0192n.06
Filed: March 10, 2009

No. 07-2174

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **REGINALD LETT**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Petitioner-Appellee,* | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| **PAUL RENICO**, | ) | **O P I N I O N** |
| | ) | |
| *Respondent-Appellant.* | ) | |

BEFORE:    COLE and GIBBONS, Circuit Judges; FORESTER, Senior District Judge.[*]

**COLE, Circuit Judge**.  Warden Paul Renico appeals from the district court's judgment granting Petitioner-Appellant Reginald Lett a writ of habeas corpus.  The district court determined that the state trial court's declaration of a mistrial and subsequent retrial violated Petitioner's right not to be placed twice in jeopardy.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

The material facts are not in dispute.  Lett was charged with first-degree murder and possession of a firearm during the commission of a felony in connection with the shooting death of Adesoji Latona at a liquor store in Detroit, Michigan.  His first trial commenced on June 2, 1997,

---

[*] The Honorable Karl S. Forester, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

and though it spanned a period of ten days, it consisted of approximately ten hours of testimony in four days, not including voir dire and closing statements. The parties presented testimony from seventeen witnesses, either in person or through transcripts of prior proceedings. The trial judge instructed the jury on June 12, 1997. The jury began deliberating at 3:24 p.m. that day and was excused at 4:00 p.m. The jury resumed its deliberations the following morning. During the course of its deliberations, the jury sent seven notes to the trial judge. These notes are not contained in the record, but according to the Michigan Supreme Court, "[m]ost of the notes were routine requests for evidence, instructions, and breaks." *People v. Lett*, 644 N.W.2d 743, 745 n.2, 753 (Mich. 2002). One note, "sent out early on the second day of deliberations, stated that the jurors had 'a concern about our voice levels disturbing any other proceedings that might be going on.'" *Id*. at 745 n.2. The last note stated, "What if we can't agree? Mistrial? Retrial? What?" *Id*. at 745. At 12:45 p.m., upon receiving this note, the trial judge called the jury into the courtroom and the following exchange took place:

> THE COURT: You may be seated. Is the jury present and properly seated, counsel?
>
> MR. HEAPHY [PROSECUTOR]: Yes, your Honor.
>
> MR. GORDON [DEFENSE COUNSEL]: Yes, Judge.
>
> THE COURT: I received your note asking me what if you can't agree? And I have to conclude from that that that is your situation at this time. So, I'd like to ask the foreperson to identify themselves, please?
>
> (The foreperson identified herself)
>
> THE COURT: Okay, thank you. All right. I need to ask you if the jury is deadlocked; in other words, is there a disagreement as to the verdict?

THE FOREPERSON:  Yes, there is.

THE COURT:  All right.  Do you believe that it is hopelessly deadlocked?

THE FOREPERSON:  The majority of us don't believe that --

THE COURT:  (Interposing) Don't say what you're going to say, okay?

THE FOREPERSON:  Oh, I'm sorry.

THE COURT:  I don't want to know what your verdict might be, or how the split is, or any of that.  Thank you.  Okay?  Are you going to reach a unanimous verdict or not?

THE FOREPERSON:  (No response)

THE COURT:  Yes or no?

THE FOREPERSON:  No, Judge.

THE COURT:  All right.  I hereby declare a mistrial.  The jury is dismissed.

(Jury discharged at about 12:48 p.m.)

(Trial Tr. 319, Joint Appendix "JA" 150.)

Subsequently, Lett was retried on charges of first-degree murder and possession of a firearm during the commission of a felony ("felony-firearm").  The second jury convicted him of the lesser offense of second-degree murder under section 750.317 of the Michigan Compiled Laws and felony-firearm under section 750.227b of the Michigan Compiled Laws.  Lett was sentenced to sixteen-to-forty years' imprisonment.

On appeal to the Michigan Court of Appeals, Lett claimed that his retrial violated the double jeopardy prohibitions in the Michigan and United States Constitutions because the trial judge's sua sponte termination of the first trial was without manifest necessity and without Lett's consent.

*People v. Lett*, No. 209513, 2000 Mich. App. LEXIS 1841 (Mich. Ct. App. Apr. 21, 2000). The

Michigan Court of Appeals agreed and reversed the convictions. *Id*. at *10. The Michigan Supreme

Court, over a dissent, reversed the Court of Appeals. *Lett*, 644 N.W.2d at 750. It held that the retrial

did not violate the double jeopardy bar because the record contained "sufficient justification" for the

trial judge's conclusion that there was "manifest necessity" for a mistrial. *Id*. The Michigan

Supreme Court found that the reasons for the trial judge's actions were "plain and obvious" from the

record, so there was no need for the trial judge to articulate her reasoning. *Id*. at 754. Furthermore,

it determined that, although a "deadlocked jury" instruction might appropriately have been given,

Lett did not request such an instruction, and a judge is not required to explain a decision to declare

a mistrial on the basis of jury deadlock, nor to consider certain alternatives before making such a

declaration. *Id*. at 752-53.

In habeas corpus proceedings under 28 U.S.C. § 2254, the United States District Court for

the Eastern District of Michigan disagreed and granted Lett's petition for a writ of habeas corpus.

*Lett v. Renico*, 507 F. Supp. 2d 777, 788 (E.D. Mich. 2007). The district court concluded that the

trial judge's decision to declare a mistrial was not an exercise of sound discretion nor required by

manifest necessity, and that the Michigan Supreme Court's conclusion to the contrary was an

unreasonable application of federal law. The district court noted that the trial judge made no

findings, provided no reasoning or justification, and entertained no argument from counsel.

## II. DISCUSSION

### A. Standard of review

We review de novo the district court's ruling on Lett's habeas petition. *See Abela v. Martin*,

380 F.3d 915, 924 (6th Cir. 2004). The standard set forth in the Antiterrorism and Effective Death

Penalty Act of 1996, ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, governs our review:

> AEDPA prohibits a federal court from granting a writ of habeas corpus to a person in custody pursuant to a state court judgment with respect to a claim that was adjudicated on the merits in state court unless the adjudication of that claim --
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*See Morales v. Mitchell*, 507 F.3d 916, 929 (6th Cir. 2007) (quoting AEDPA, 28 U.S.C. § 2254 (d))

(internal quotation marks omitted). The phrase "clearly established [f]ederal law" refers to "the

holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *Williams v. Taylor*, 529 U.S.

362, 412 (2000). A decision is "contrary to" clearly established federal law if "the state court arrives

at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state

court decides a case differently than [the] Court has on a set of materially indistinguishable facts."

*Id*. at 412-13. An "unreasonable application" of clearly established federal law occurs if a "state

court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably

applies it to the facts of the particular state prisoner's case." *Id*. at 407. "[A]n *unreasonable*

application of federal law is different from an *incorrect* application of federal law." *Id*. at 410. We

ask, therefore, "whether the state court's application of clearly established federal law was

objectively unreasonable." *Id*. at 409.

**B.      Double Jeopardy Analysis**

"[T]he Supreme Court has recognized that the [F]ifth [A]mendment's prohibition against placing a defendant twice in jeopardy reflects a constitutional policy of finality for the defendant's benefit in all criminal proceedings, and is 'fundamental to the American scheme of justice.'" *Jones v. Hogg*, 732 F.2d 53, 54 (6th Cir. 1984) (quoting *United States v. Jorn*, 400 U.S. 470, 479 (1971) (plurality opinion)). According to the Supreme Court:

> The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States*, 355 U.S. 184, 187-88 (1957). A court may not force a defendant to undergo retrial on a matter that concluded without a conviction or acquittal unless there was "manifest necessity" for declaring a mistrial. *Arizona v. Washington*, 434 U.S. 497, 505 (1978). "Necessity" is not interpreted literally in this context; rather, "there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." *Id*. at 506. A trial judge's belief that a jury is "genuinely deadlocked" is the "classic basis for a proper mistrial." *Id*. at 509. Trial judges are "accorded great deference by [] reviewing court[s]" in deciding whether a jury is deadlocked. *Id*. at 509. One reason for this deference is to ensure that trial judges do not feel compelled to "employ coercive means to break [an] apparent deadlock," but rather remain free "to discharge a jury which is unable to reach a verdict after protracted and exhausting deliberations" so as to avoid the "significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors." *Id*. at 509-10.

While a trial judge's decision to declare a mistrial due to jury deadlock is accorded great deference, such a decision may only be upheld if it was based upon an exercise of "sound discretion." *See id.* at 514 (the recognition of great deference due to the trial judge "does not, of course, end the inquiry[;] . . . reviewing courts have an obligation to satisfy themselves that . . . the trial judge exercised 'sound discretion in declaring a mistrial.'"). "[I]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for [great] deference by an appellate court disappears." *Id.* at 510 n.28, 514. "[D]iscretion does not equal license; the Fifth Amendment's guarantee against double jeopardy would be a sham if trial judges' declarations of 'necessary' mistrials were in fact to go unreviewed." *United States v. Sisk*, 629 F.2d 1174, 1178 (6th Cir. 1980).

1.      *"Sound discretion" as defined by the United States Supreme Court*

Sound discretion, as defined in *Arizona v. Washington*, is "careful consideration to [a defendant's] interest in having the trial concluded in a single proceeding." 434 U.S. at 516. Sound discretion requires the trial judge to "evinc[e] a concern for the possible double jeopardy consequences of an erroneous ruling." *Id.* at 515. Sound discretion means acting "deliberately," "responsibly," and "careful[ly]," not "precipitately," "hast[ily]," and "improvident[ly]." *Id.* at 514 n.34, 515-16. While taking into account the views of counsel may not always be required, sound discretion is typified by giving "both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial." *Id.* at 515-16.

The Supreme Court has repeatedly made clear that the power to declare a mistrial may not be exercised cavalierly. Justice Story, in formulating the classic test for "manifest necessity," which

required an exercise of "sound discretion," stated that while it was "impossible to define all the circumstances, which would render it proper [to declare a mistrial] . . . the power ought to be used with the greatest caution . . . ." *United States v. Perez*, 22 U.S. (9 Wheat) 579, 580 (1824). Since then, the Supreme Court has enforced the principle that a "judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *Jorn*, 400 U.S. at 486. In *Jorn*, the Supreme Court found a double jeopardy violation where the judge abruptly declared a mistrial upon learning that certain witnesses had not received adequate warnings about self-incrimination. *Id*. at 486-87. The Supreme Court stated, "it seems abundantly apparent that the trial judge made no effort to exercise a sound discretion to assure that, taking all the circumstances into account, there was a manifest necessity for the *sua sponte* declaration of this mistrial." *Id*. at 487 (emphasis added); *see also Fulton v. Moore*, 520 F.3d 522, 528 (6th Cir. 2008) (stating that the *Jorn* decision "turned largely on the court's finding that the trial judge acted abruptly, gave no consideration to a trial continuance, and allowed the parties no opportunity to argue or even object"). That a mistrial may not be declared without caution, deliberation, and a consideration of the defendant's Fifth Amendment rights is clear from *Perez*, *Jorn*, and *Washington*.

> 2.  *This Circuit's application of the Supreme Court's "sound discretion" rulings*

While we review the Michigan Supreme Court's decision to determine only whether it was objectively unreasonable in light of the holdings of the Supreme Court, we may look to this Court's prior decisions applying those holdings to determine whether the relevant legal principle has been

clearly established. *See Smith v. Stegall*, 385 F.3d 993, 998 (6th Cir. 2004); *see also Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) ("While the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue.").

In *Fulton v. Moore*, 520 F.3d at 529, we reviewed a habeas petition based on a double jeopardy claim and held that *Arizona v. Washington* sets forth three factors that determine whether a judge has exercised sound discretion in declaring a mistrial: whether the judge (1) heard the opinions of the parties' counsel about the propriety of the mistrial; (2) considered the alternatives to a mistrial; and (3) acted deliberately, instead of abruptly. In *Fulton*, we found an exercise of sound discretion, partly because the trial judge engaged in a "lengthy colloquy with the lawyers" about the need to postpone the trial and discussed with them the double jeopardy implications of a mistrial. *Id*. Similarly, in *Klein v. Leis*, 548 F.3d 425, 433 (6th Cir. 2008), we applied the factors articulated in *Fulton* and found that, although the trial judge had not permitted argument on the propriety of a mistrial before declaring it, he had exhibited sound discretion because he had repeatedly warned the pro se defendant that his conduct was unacceptable and would result in a mistrial if not corrected.

In another double jeopardy habeas case, *Johnson v. Karnes*, 198 F.3d 589, 595 (6th Cir. 1999), we considered the actions of a state trial judge who had "pressured the prosecutor to make [a] decision [to request a mistrial] at that very moment and only allowed a very brief recess before listening to counsel's arguments regarding the mistrial." We found that the judge's hasty and impulsive declaration violated the requirement found in *Perez*, *Jorn*, *Washington*, and other Supreme

Court cases that a trial court must "'shoulder its *Perez* burden of sound discretion'" by exercising a "'degree of careful consideration and solicitude for the serious consequences attendant upon mistrials.'" *Johnson*, 198 F.3d at 595 (quoting *Glover v. McMackin*, 950 F.2d 1236, 1241 (6th Cir. 1991)).

  3.  *The record does not support a finding of sound discretion*

In this case, the trial judge's actions exhibited haste and a lack of consideration for Lett's rights that fell short of the sound discretion required. The primary basis for the Michigan Supreme Court's finding that the trial judge exercised sound discretion was the jury foreperson's statement that the jury was not going to reach a unanimous verdict. However, a review of the colloquy in which this statement was made shows that the foreperson's response cannot carry the weight placed upon it by the Michigan Supreme Court. First, the judge inferred from the jury's note asking what would happen *if* they could not agree that the jury was *already* "hopelessly" deadlocked. The note—"What if we can't agree? [M]istrial? [R]etrial? [W]hat?"—was not a statement that the jury was hopelessly deadlocked, or even deadlocked at all. The note was asking the judge for more information, which suggests that the answer to the question would have impacted the deliberations as they continued.

Next, the judge improperly conflated deadlock with mere disagreement, stating: "I need to ask you if the jury is deadlocked; in other words, is there a disagreement as to the verdict?" Contrary to the judge's implication to the foreperson, mere disagreement, which is to be expected among deliberating jurors, is not equivalent to the type of genuine deadlock that justifies the drastic remedy of a mistrial. Then, instead of allowing the foreperson to answer her question, the judge cut off her

response, assuming—perhaps correctly and perhaps not—that the foreperson was about to state the breakdown of votes among the jurors. It is possible that the foreperson was attempting to tell the judge whether or not a majority of the jurors believed the jury was deadlocked. Rather than pausing to inquire about such a possibility or to poll the jurors individually, the judge forced the foreperson to provide an immediate response on behalf of the whole jury. When the foreperson hesitated, the judge demanded a "yes or no" answer. This insistence on haste and refusal to allow the foreperson to elaborate, combined with the judge's already-expressed opinion that the jury was deadlocked, exerted inappropriate pressure to acquiesce in the judge's conclusion. *Cf. Johnson*, 198 F.3d at 595 (holding that it was inconsistent with sound discretion to demand an immediate decision from prosecutor about whether to seek mistrial). The instant the foreperson replied, the judge declared a mistrial and discharged the jury, affording counsel no opportunity to present their views. Even the prosecution later acknowledged that the judge's precipitous declaration "clearly was error." (Post-Conviction Hr'g Tr., July 7, 2000, JA 152-53.) For these reasons, the Michigan Supreme Court's conclusion that the trial judge exercised "sound discretion" and "careful consideration to [Lett's] interest in having the trial concluded in a single proceeding," as required by *Arizona v. Washington*, 434 U.S. at 516, was objectively unreasonable.

The Michigan Supreme Court also found that the jury's note reporting "concern about [their] voice levels disturbing [] other proceedings" supported the trial judge's finding of deadlock. *Lett*, 644 N.W.2d at 745 n.2, 753. The jury sent this note early on the second day of deliberations—in other words, near the beginning of its deliberations, since the first "day" of deliberations lasted thirty-five minutes. Taking the note at face value, the jurors may simply have been concerned that

they were disrupting other proceedings.  Even accepting the Michigan Supreme Court's suggestion that the note indicated the deliberations had become "acrimonious," *id*. at 745 n.2, this note does not correct the serious problems arising from the judge's colloquy.

The Michigan Supreme Court also concluded that the length of the jury's deliberations was such that the trial judge could reasonably have concluded that it was genuinely deadlocked.  *Id*. at 753.  However, as the district court pointed out, it would be remarkable if the jurors had had time even to review the testimony of the seventeen witnesses in the brief span of three or four hours (broken into two days and punctuated by breaks), much less reach a conclusion that they were hopelessly deadlocked.  The extremely serious nature of the crime and the potential punishment for the defendant also suggests that the jury should have been permitted more time to deliberate.  Juries often initially report themselves deadlocked after several hours and then proceed to reach unanimous verdicts.  The short amount of time the jury actually deliberated clearly did not constitute the "protracted and exhausting" experience that creates a "significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors." *Washington*, 434 U.S. at 509-10.

The Michigan Supreme Court also relied on the fact that neither party objected to the mistrial declaration, *Lett*, 644 N.W.2d at 753, but this reliance is inappropriate in light of the facts of this case and the Supreme Court's holding in *Jorn*.  In *Jorn*, the Supreme Court stated, "the trial judge acted so abruptly in discharging the jury that, had the . . . defendant [been disposed] to object to the discharge of the jury, there would have been no opportunity to do so."  400 U.S. at 487.  In reliance on *Jorn*, we have stated:

> Nothing in the record before us indicates a willingness of petitioner to acquiesce in the mistrial order. Although he did fail timely to object, it is apparent that such an objection would have been difficult, and probably futile. At no point before the actual declaration of the mistrial was it even mentioned on the record as a potential course of action by the court. The summary nature of the trial court's actions, a swift declaration followed by the immediate dismissal of the jury and adjournment of the court, rendered an objection both unlikely and meaningless.

*See Glover*, 950 F.2d at 1240 (citing *Jorn*, 400 U.S. at 487); *see also Jones v. Hogg*, 732 F.2d at 57 (granting habeas where record did not reflect exercise of sound discretion regardless of defendant's failure to object, stating "[c]onsent to a mistrial order should only be implied where the circumstances positively indicate a defendant's willingness to acquiesce in the order"). In light of *Jorn*, as well as *Glover* and *Jones*, the record in this case does not support a determination that the trial judge understood Lett to have acquiesced in her decision to declare a mistrial.

In addition, the three *Washington* factors distilled by this Court in *Fulton*, 520 F.3d at 529, all weigh heavily against a finding of sound discretion in this case. First, the trial judge declared a mistrial without pausing to hear from counsel, and the brief colloquy leading to the judge's declaration—lasting all of three minutes—was immediately followed by the dismissal of the jury, providing counsel no opportunity to object. Second, the record does not indicate that the trial judge gave any consideration to the alternatives to declaring a mistrial, such as giving a "deadlocked jury" instruction, polling the jury, answering the question posed in the jury's note about what would happen if it was unable to reach a unanimous verdict, or allowing the jury more time to deliberate. Any of these courses of action would have been reasonable, given that the jury had only deliberated for three or four hours in this first-degree murder trial. Third, and most troubling, the judge's declaration was inexplicably abrupt, making it "abundantly apparent that the trial judge made no

effort to exercise a sound discretion to assure that, taking all the circumstances into account, there was a manifest necessity for the *sua sponte* declaration of this mistrial." *Jorn*, 400 U.S. at 487.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's determination that the Michigan Supreme Court was objectively unreasonable in finding that the trial judge exercised sound discretion in declaring a mistrial, and we **AFFIRM** the grant of a writ of habeas corpus.

No. 07-2174
*Lett v. Renico*

**FORESTER, Karl S., Dissenting**

I agree with the well written majority opinion on all points except the majority's conclusion that the Michigan Supreme Court's decision to reinstate the defendant's conviction was an unreasonable application of clearly established federal law. Because I believe that the state supreme court's careful evaluation of whether the trial judge exercised "sound discretion" when she determined that the jury was deadlocked was not an unreasonable application of federal law, I respectfully dissent from that portion of the majority's opinion.

The Michigan Supreme Court looked to *Washington*, clearly established federal law, to determine how it should evaluate the case. It found that, even though the trial judge did not attempt to justify the declaration herself, the declaration of the mistrial was permissible because it was "clear and obvious" from the record that the jury was deadlocked. In support of this finding, the court cited the notes that the jury sent to the judge, including one asking whether the level of their voices had disturbed anyone and one asking what happened if they could not agree, and the discussion on the record between the judge and foreperson wherein the foreperson said that the jurors could not reach a unanimous verdict. This careful evaluation cannot be said to be "contrary to" or an "unreasonable application of" federal law.

A trial judge is in a far superior position to determine whether a jury is genuinely deadlocked and whether it is beneficial to the interests of justice to send the jury for further deliberations. This case involved relatively few and simple, although serious, charges and did not involve a great deal of testimony or evidence. Further, there is no evidence on the record that the trial judge was motivated to declare a mistrial for reasons other than the interests of justice. Most importantly, when

- 15 -

asked if the jury was "going to reach a unanimous verdict or not?" the jury foreperson responded, "No, Judge."

Petitioner asserts that the trial judge could have employed a host of other actions prior to granting the mistrial. While I agree that the trial judge could have done more to establish on the record the basis for her determination that the jury was genuinely deadlocked, no Supreme Court holdings require specific findings on the record by a trial court and no Supreme Court holdings require proof that specific actions have been considered or taken prior to declaring mistrial due to a deadlocked jury. Further, from a policy standpoint, an appellate court needs to be hesitant to second guess a trial judge who is in a difficult position – the trial judge does not want to coerce the jury into making a decision but also does not want to face acquittal motions based on double jeopardy if he/she improperly declares a mistrial. Given the standard of review under AEDPA and the Supreme Court's statement in *Washington* that an appellate court should give a trial judge's determination of jury deadlock "great deference," I believe that we should not disturb the trial judge's conclusion that the jury was deadlocked.

Because I believe that the state trial court exercised sound discretion in its determination that the jury was deadlocked constituting manifest necessity to declare a mistrial and the Michigan Supreme Court's decision to reinstate the conviction was a proper application of federal law, I believe that the district court's decision to grant Petitioner a writ of habeas corpus should be reversed.