IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JULY 1997 SESSION

FILED

December 4, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| KENNETH LEE PIPKIN, | ) | No. 01C01-9608-CC-00328 |
| | ) | |
| Appellant | ) | |
| | ) | STEWART COUNTY |
| V. | ) | |
| | ) | HON. ROBERT E. BURCH, |
| STATE OF TENNESSEE, | ) | JUDGE |
| | ) | |
| Appellee. | ) | (Post-Conviction) |
| | ) | |
| | ) | |

For the Appellant:

Shipp R. Weems
District Public Defender

Robbie T. Beal
Assistant Public Defender
P.O. Box 160
Charlotte, TN 37036

For the Appellee:

John Knox Walkup
Attorney General and Reporter

Peter M. Coughlan
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

Dan Mitchum Alsobrooks
District Attorney General

George Sexton
Assistant District Attorney
Humphrey County Courthouse
Waverly, TN 37185

OPINION FILED: _____

AFFIRMED IN PART; REVERSED IN PART
DELAYED APPEAL GRANTED

William M. Barker, Judge

**OPINION**

The appellant, Kenneth Lee Pipkin, appeals as of right the denial of his post-conviction petition by the Stewart County Circuit Court. On appeal, he contends that his trial counsel was ineffective: (1) for failing to remove a biased juror from the jury panel; (2) for failing to challenge the qualifications of an expert witness; (3) for failing to thoroughly cross-examine a witness; (4) for seeking a continuance of the case which was prejudicial to appellant; and (5) for failing to properly inform appellant about his right to appeal. We conclude that counsel was ineffective in advising appellant about pursuing an appeal, thus resulting in a waiver of that right which was not voluntary or knowing. Therefore, we grant appellant the opportunity to pursue a delayed appeal. In all other respects, we affirm the trial court.

**Factual Background**

Marilyn June Adkins disappeared on December 30, 1990 and law enforcement officials found physical evidence to indicate that foul play was involved. Authorities discovered her abandoned car at the end of a deserted road and it appeared that someone had tried to run it over an embankment. Not too far away, the contents of Adkins' purse were found strewn on the side of the road in a logging area. A few miles away in a pine thicket, they found a pool of blood on the ground and a watch belonging to Adkins. Near the Paris Landing Bridge in Stewart County, authorities found a quilt, stained with blood, and a pair of brown jersey work gloves that had been thrown over an embankment. Despite extensive searches and efforts, they were unable to locate the victim's body. In September of 1992, appellant was indicted for the first degree murder of Adkins. Her body had not been recovered.

Appellant's trial was set in August of 1993, but was continued due to defense counsel's difficulties in interviewing witnesses. After the continuance, rather unexpectedly, a commercial fisherman discovered the remains of a body in the Tennessee River on August 23, 1993. Only the lower portion of a body, from the waist

2

down, was recovered.  At appellant's trial in March of 1994, the State offered proof that the remains were that of a white female, between the ages of 37 and 42, approximately 5'5" tall.  This was consistent with the physical description of the victim. Testimony also indicated that based upon the degree of decomposition, the body had likely been submerged for one to five years.  In addition, some of the victim's family members identified the pants and shoes that were found on the remains.  The cause of death could not be ascertained due to the incomplete remains.

In implicating the appellant, testimony reflected that a witness had seen the victim and appellant together in appellant's truck at a boat dock several hours before she disappeared.  The State alleged that the two were having an affair.  Expert testimony demonstrated that the blood found on the ground and the quilt was consistent with that of the victim.[1]  The State alleged the quilt belonged to the appellant, introducing testimony that he often covered the seat of his truck with a patchwork quilt, similar to the one discovered.  The brown work gloves found with the quilt were shown to be of the kind appellant used in operating a chain saw in his logging work. They smelled of gasoline and similar gloves were also found in a search of appellant's home.

Appellant was convicted by a jury of the second degree murder of Adkins. Appellant received the minimum fifteen year sentence as a result of his conviction. On March 25, 1996, he filed a *pro se* post-conviction petition alleging ineffective assistance of counsel.  The trial court appointed counsel and held an evidentiary hearing.  After accepting proof on the issues, the trial court dismissed appellant's petition, ruling that he did receive the effective assistance of counsel.

---

[1]A TBI Agent with expertise in serology testified that the blood on the ground and on the quilt were consistent with the victim's blood and that the blood was definitely not the appellant's.  Apparently, DNA testing was also performed by the FBI and the State offered testimony on this issue as well.  That testimony was omitted from the trial transcript submitted in the record before us.

**Analysis**

In reviewing the appellant's Sixth Amendment claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To prevail on a claim of ineffective counsel, an appellant "must show that counsel's representation fell below an objective standard of reasonableness" and that this performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687-88, 692, 694, 104 S.Ct. 2052, 2064, 2067-68, 80 L.Ed.2d 674 (1984); Best v. State, 708 S.W.2d 421, 422 (Tenn. Crim. App. 1985). The inability to prove either prong results in failure of the claim. See Strickland, 466 U.S. at 697.

The most difficult burden on an appellant is demonstrating the prejudice he has suffered by the alleged error. In order to prevail on that ground, the appellant must show a reasonable probability that but for counsel's error the result of the proceeding would have been different. Id.

In order to sustain his post-conviction petition, the appellant must prove his allegations of fact by clear and convincing evidence. Tenn. Code Ann. §40-30-210(f) (Supp. 1996). On review, this Court cannot re-weigh or re-evaluate the evidence. We give deference to questions about the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence as they are resolved by the trial court. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Furthermore, the factual findings of the trial court are conclusive on appeal unless the evidence preponderates against the judgment. Id. See also Davis v. State, 912 S.W.2d 689, 697 (Tenn. 1995) (citations omitted); Cooper v. State, 849 S.W.2d 744, 746 (Tenn. 1993) (citation omitted).

Appellant first claims that his trial counsel was ineffective for failing to challenge a biased juror during voir dire. Appellant's testimony at the post-conviction hearing

4

reflected that he had once gone on a date with potential juror Vicki Angel. When Angel denied knowing the appellant during voir dire, he informed his counsel that he had dated her, that she might be "against him," and requested counsel to remove her from the jury. Appellant's wife, a native of Stewart County who actively participated in jury selection, corroborated appellant's testimony. She also told counsel that Angel lied when she denied knowing the appellant.

At trial, appellant was represented by three retained attorneys, James Sanderson, William Hatton, and Steve Hale. Both Hale and Hatton testified at the post-conviction hearing.[2] Hale testified that he remembered appellant telling them that he had dated Angel. He stated that when they asked appellant if she would be a problem, he replied, "No." Considering that Angel did not reveal the relationship and that appellant did not perceive her to be a problem, Hale testified that they believed she might be helpful. Therefore, they made a tactical decision not to strike her from the jury panel. Similarly, Hatton recalled that appellant told them that he and Angel had a pretty good relationship and that she would probably be fair. He did not remember appellant asking them to remove Angel.

The trial court found that counsel exercised their best judgment in keeping Angel on the jury panel. The trial court stated its belief that counsel felt she was somewhat of a "wildcard" who could be beneficial to appellant. It found that this tactical decision was not ineffective. We find this conclusion supported by the record and will not disturb this finding. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Appellant has failed to carry his burden on this issue.

Next, appellant argues that his counsel was ineffective for failing to challenge the qualifications of one of the State's numerous expert witness. He argues that counsel should have objected to the qualifications of Emily Craig because her methods were not subjected to the Frye test. See Tenn. R. Evid. 702 Advisory

---

[2]Mr. Sanderson was unable to appear and testify at the evidentiary hearing due to serious health problems. At that time, he was hospitalized and awaiting a heart transplant.

Commission Comments. He also questions her status as an expert because she did not possess a doctoral degree.

Emily Craig was proffered by the State to testify as an expert on the race of the human remains recovered from the river. Her preliminary testimony demonstrated that she was a doctoral student studying under Dr. William Bass at the University of Tennessee in forensic anthropology. She had a master's degree from the Medical College of Georgia and was slated to receive her doctoral degree in approximately five months. Her specialty in forensic anthropology was in the knee and shoulder, an area in which she had extensive training from working at the Houston Orthopaedic Clinic for fifteen years.

Craig explained that she had spent the last three years researching a method to determine a person's race by measuring the end of the femur and the angle in the knee joint. In addition to being the topic of her dissertation, she had also written an article on that subject which had been accepted for publication. She stated that this area was not a new field of study, but rather a new method. Using this method, she testified that the human remains in this case were of a white or Caucasian person. On cross-examination, Craig stated that she believed her methods had been generally accepted by the forensic science community.

At the evidentiary hearing, counsel Bill Hatton testified that he and Sanderson discussed all the expert testimony prior to trial and stated that they had notice of Craig's qualifications. He recalled that the district attorney questioned her thoroughly about her qualifications before the jury. He also remembered her background included authoring a dissertation on the topic and fifteen to twenty years of education and research in the field. Hatton testified that based on that information, they chose not to challenge her as an expert witness.

On this issue, the trial court found that expert witnesses do not necessarily have to possess a doctoral degree. It acknowledged that Craig's methods were not subjected to the Frye test, but found no indication in record that she would not have

6

met this test.  More importantly, however, the trial court found that appellant was not prejudiced by her testimony because it was cumulative.

We agree with the trial court that appellant suffered no prejudice from the alleged error.  When Craig testified, the State had already presented testimony from Dr. Charles Harlan, the chief medical examiner for the State of Tennessee.  In testifying about the autopsy he performed on the remains, Dr. Harlan stated that the remains were of a white female.  More significantly, the victim's family members identified the clothing on the remains as that of the victim.  We agree with the trial court that testimony from the family members was the most important and persuasive evidence on this issue.  Even if counsel had objected and Craig's testimony excluded, we believe the result would have been the same.  Thus, appellant has failed to show prejudice.  Strickland v. Washington, 466 U.S. 668, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Appellant also believes his counsel was ineffective for failing to more thoroughly cross-examine Billy Crane, a key witness for the State.  Crane testified that he was at the Dyer's Creek Boat Dock on the afternoon of December 30, 1990.  While there, he saw a newer model red pickup truck and a 1970's model blue Thunderbird[3] parked side by side.  No one was seated in the Thunderbird.  However, he noticed a man and woman sitting in the truck talking.  He also testified that as he left the boat dock and proceeded to the main road, he noticed the blue Thunderbird behind him.  As he pulled onto Highway 79, he also noticed the red truck was following the blue Thunderbird.

On cross-examination, Crane was unable to say that the man he saw in the pickup truck was the appellant.  He stated the woman had brown hair, but he did not know her.  Furthermore, Crane was unable to say whether the truck was a Chevrolet or GMC and he stated there were no distinguishing features about the truck.

---

[3]Earlier proof had shown that the victim's car, discovered by authorities, was a 1979 blue Thunderbird.

7

Proof at trial had demonstrated that appellant was driving a newer model, red, Chevrolet pickup truck in December of 1990. Appellant argues that counsel should have used pictures of appellant's truck in his cross-examination of Crane. According to appellant, these pictures would have shown that his truck had several distinctive accessories, such as a black tailpiece, black rails, and a black hood scoop. His truck also had the word "Chevrolet" in large black letters on the back. According to appellant, showing these pictures to the jury would have weakened Crane's testimony since he testified that the pickup he saw had no distinctive features.

Hatton testified that Crane was an intelligent and articulate witness and that he considered his testimony very damaging. In light of this, Hatton testified that his strategy was to perform a brief cross-examination and try to get Crane to indicate anything favorable to appellant's defense. The trial court found that to be sound trial strategy. It noted that counsel was able to get Crane to admit he did not know whether it was a GMC or Chevrolet truck. The trial court further remarked that it is often wise not to press for favorable testimony from witnesses like Crane because they often offer more damaging information. In the words of the trial court, counsel's tactic "was a good piece of work."

We agree with the trial court that the method of cross-examination of Crane was a tactical decision made by counsel. We must give deference to such decisions if they are informed ones that are the result of adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982) (citations omitted). See also Cooper v. State, 849 S.W.2d 744, 746 (Tenn. 1993). Having taken Crane's deposition well before the trial, Hatton was aware of Crane's testimony and prepared his cross-examination accordingly. We cannot fault his cross-examination strategy for an articulate and persuasive witness who possessed damaging information. Moreover, our review of the record indicates that there was a careful and effective cross-examination of the witness. Appellant is entitled to no relief on this issue.

8

Appellant contends that his counsel was ineffective for seeking a continuance of the trial when the victim's body had not yet been discovered. He argues that without a body, the State's case was considerably weaker and may have resulted in an acquittal.

According to testimony at the post-conviction hearing, appellant's case was set for trial in August of 1993. On that date, a continuance was sought by the defense[4] because counsel had not completed interviewing witnesses and were experiencing difficulty in contacting many of them. Less than one week after the trial court granted the continuance, the partial body was discovered.

The trial court found that defense counsel were not ineffective for seeking the continuance. The trial judge, who presided at the post-conviction hearing, remembered that defense counsel were unable to properly prepare the case because many potential witnesses were unwilling to talk with them. When he learned of this difficulty on the day of trial, he notified the assistant district attorney and advised him that he was going to continue the case and order that depositions be taken. The witnesses were placed under subpoena and their depositions taken the day which had been scheduled for trial.

According to the trial court's findings, the pivotal issue at that juncture of the case was defense counsel's preparation for trial. As counsel stated and the trial court confirmed, no one expected the body to appear more than two years after the disappearance. Counsel testified that although in retrospect the continuance may have hurt the appellant, at that time, the risk of going to trial unprepared was more significant and would have harmed appellant's case more. We agree. Counsel was not incompetent for seeking a continuance in a first degree murder trial involving extensive expert testimony when they had been unable to interview all of the State's witnesses. Merely because in hindsight the tactic may have been harmful to appellant

---

[4]Counsel Steve Hale testified that he reviewed his records and was unable to find that the defense made a formal motion for a continuance.

does not make counsel's assistance ineffective. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). As the trial court stated, "We demand competence of lawyers. But we certainly can't ask clairvoyance." We concur in the trial court's decision that counsel was not ineffective in this respect.

Finally, appellant alleges that his counsel provided ineffective assistance in persuading him to waive his right to appeal.[5] At the evidentiary hearing, appellant explained that Mr. Sanderson visited him at the jail the day after he was convicted. Sanderson advised him not to pursue a hearing on a motion for new trial. He told appellant that there were no trial errors and he probably could not get a new trial. However, Sanderson told appellant that even if he did get a new trial, he would be defending first degree murder charges and could get a life sentence.

After appellant was sentenced, he testified that he wanted a hearing on a motion for new trial and an appeal. Both he and his wife tried to contact his counsel in this regard. However, he stated that counsel never visited him at the jail again. Instead, he received a waiver of appeal in the mail, which he signed.[6]

Appellant's wife testified that she and appellant were interested in pursuing an appeal. However, counsel advised her that it was a bad idea because appellant could face first degree murder charges again. In fact, she stated that counsel told her there was a very good chance on appeal that appellant would be brought "back in on first degree murder charges."[7] Counsel also advised Mrs. Pipkin that the State had considered the possibility of charging her in the crime as well. Mrs. Pipkin further testified that counsel said it would be best not to appeal and she inferred from his attitude that he did not want to appeal the case.

---

[5]Appellant initially raised this ground in his *pro se* petition. Proof was taken on this issue at the evidentiary hearing and summarized in the statement of facts of appellant's brief. However, we note that no discussion on this issue appears in the brief. We have chosen to address the issue irrespective of the omission.

[6]The waiver of appeal is not included in the record before us.

[7]No evidence was introduced in contradiction.

10

Steve Hale testified that he talked with the appellant on at least two occasions about his sentence and an appeal. He also testified that it was his opinion that there was no reversible error in the record. Counsel explained further:

> We had had conversations with [the district attorney's] office. We had an understanding with your office that if Mr. Pipkin did testify truthfully about what had happened, that your office would not seek enhancement on that point where he would receive the minimum sentence.
>
> And also there had -- Throughout the course of this, your office had occasionally raised the glimmer of possibility that you would be looking at someone else to possibly prosecute. And you had given -- Your office and, I believe General Alsobrooks, actually -- But your office had given us the assurance that, once again, if Mr. Pipkin had testified and testified truthfully, that you would not seek to prosecute anyone else for this crime.

The assistant district attorney followed this answer by asking:

> Q.      Did you explain to him that by testifying, he was, in fact, waiving or giving up his appeal?
> A.      Yes, sir.
> Q.      And did he at some point in time sign an actual written waiver of appeal?
> A.      I believe so, yes.

Mr. Hatton testified similarly. He recalled discussing the sentence and appeal with appellant. He stated that he advised appellant to testify at the sentencing hearing and give up the right to appeal. In response to why he gave such advice, Hatton stated:

> Well, it was due in part to an agreement that we had with your office that should Mr. Pipkin take the stand at sentencing and testify truthfully, that I didn't believe there would be any objection, as I understood it, to the minimum sentence, at least no enhancement factors would be argued.
>
> Also, as I understood as part of our agreement, there would not be further charges sought against any other family member, which had been discussed at different times.
>
> And, thirdly, I recall an agreement between my office and your office that if Mr. Pipkin took the stand and testified truthfully that there would be no opposition from any law enforcement agencies at any parole hearing he might have at any time in the future.

The assistant district attorney then asked:

> Q.      Based upon those agreements and understandings, did you then recommend that he, in fact, testify --

11

A. That's correct.

Q. -- and give up his right to appeal?

A. Yes, sir.

The trial court found that counsel's advice on the waiver of appeal was a tactical decision. It stated that counsel was unaware at that time of the issue with juror Vicki Angel, which may have been fertile ground on appeal, and that the other matters did not appear to have any chance for success. Therefore, the trial court found that trading the appeal for the minimum sentence was a good tactical decision.

We believe the record preponderates against the trial court's judgment on this issue. Our review of the record does not indicate that the waiver of appeal was part and parcel of the agreement with the district attorney. As Hatton testified, the agreement was that if the appellant testified truthfully at the sentencing hearing: (1) no enhancement factors would be sought; (2) no other family member would be prosecuted; and (3) no opposition at appellant's later parole hearings. The agreement did not include the appellant's waiver of his appeal. Neither did Hale's testimony indicate this was a part of the agreement. Hale merely agreed that he advised appellant that by testifying he was "in fact waiving or giving up his right to appeal." From our review, appellant was advised by counsel that if he testified at the sentencing hearing, he was waiving his right to appeal. With this we cannot agree.

While the implication of appellant's testimony at the sentencing hearing[8] was that he would receive the minimum sentence and, arguably, have no grounds upon which to appeal the sentence, we do not find that his testimony had any bearing on his right to appeal errors that occurred during the trial. Therefore, appellant was not properly informed about the circumstances surrounding his waiver of the right to appeal.

---

[8]It appears that appellant did testify at the sentencing hearing and as a result received the minimum sentence. However, the transcript of that hearing was not included in the record on appeal. We are unaware of the circumstances surrounding the offense about which the appellant testified at that hearing.

12

An even more egregious error, however, was Sanderson's advice to appellant during his visit the day after the conviction. It is uncontraverted that Sanderson told the appellant and his wife that it was unlikely that the appeal would result in a new trial, but if it did, the appellant would again be facing a first degree murder charge with a possible life sentence.

That advice was simply incorrect. When one is convicted of a lesser offense included in the charge of the original indictment, after a successful appeal he can be retried only for the convicted offense or a lesser charge, but not on the greater offense with which he was originally charged. Green v. United States, 355 U.S. 184, 191, 78 S.Ct. 221, 225, 2 L.Ed.2d 199 (1957); Johnson v. State, 397 S.W.2d 170, 173 (Tenn. 1965); King v. State, 391 S.W.2d 637, 639 (Tenn. 1965). To prosecute again on the greater offense violates principles of double jeopardy. Green, 355 U.S. at 191.

To illustrate this point, the defendant in Green was indicted for first degree murder and convicted of second degree murder. The defendant appealed the second degree murder conviction and received a new trial. At the second trial, the defendant was tried again for first degree murder and convicted of that crime. The Supreme Court held that this violated principles of double jeopardy. Green, 355 U.S. at 190-91.

Appellant's situation was identical. He was indicted for first degree murder and convicted by a jury of the lesser charge of second degree murder. In such circumstances, the jury's conviction of second degree murder acted as an implicit acquittal of the greater charge of first degree murder. Id. Had appellant appealed his conviction of second degree murder and been granted a new trial, the greatest charge the State could have sought in a retrial would be second degree murder. Hence, Sanderson's advice to appellant that he would again face first degree murder charges was clearly erroneous. Such advice does not fall within the range of competence demanded of attorneys in criminal cases. We reverse the trial court's holding on this issue.

13

There is no constitutional right to appeal, but where appellate review is provided by statute, the proceedings must comport with constitutional standards. State v. Gillespie, 898 S.W.2d 738, 741 (Tenn. Crim. App. 1994) (citations omitted). Thus, appellant was entitled to the effective assistance of counsel in pursuing his right of appeal. See Evitts v. Lucey, 469 U.S. 387, 397-98, 105 S.Ct. 830, 836-37, 83 L.Ed.2d 821 (1985). Without the proper advice about his appeal, we cannot say that appellant knowingly and voluntarily waived his right to appeal. See Tenn. R. Crim. P. 37(d); Collins v. State, 670 S.W.2d 219, 221 (Tenn. 1984). Here, counsel's wrong advice contributed to appellant's decision to waive his right to appeal. Had appellant not been informed that a successful appeal could put him at risk of being again tried on the charge of first degree murder which implicated a possible life sentence, he may not have chosen to waive his statutory right to appeal. As a result, appellant has also demonstrated prejudice from counsel's error. Consequently, appellant is entitled to pursue a delayed direct appeal. See State v. John L. Goodwin, No. 01C01-9108-CR-00242 (Tenn. Crim. App. at Nashville, November 12, 1992) ("Where waiver of the right to appeal results from legal advice by counsel which was incorrect and not given within the range of competence demanded of attorneys in criminal cases and a direct appeal would have been taken but for such misadvice, the waiver of appeal may be invalidated.").

We therefore grant appellant the opportunity to pursue a delayed direct appeal. Tenn. Code Ann. §40-30-213 (Supp. 1996). Because of the incomplete record[9] of the trial proceedings before us, we are unable to determine whether a motion for new trial was filed on behalf of the appellant. If not, the trial court shall permit the appellant to file such motion within thirty days of the filing of the mandate from this Court. See

---

[9]Counsel should ensure that a complete record on appeal is submitted. The record before us contains an incomplete trial transcript, no transcript from the sentencing hearing, no waiver of the right to appeal, nor the technical record from the trial.

Tenn. Code Ann. §40-30-213(a)(3) (Supp. 1996).  The case is remanded to the trial

court for further proceedings consistent with this opinion.


_____

William M. Barker, Judge



_____

John H. Peay, Judge



_____

Jerry L. Smith, Judge

15